IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EV3, INC., | § | |
| | § | |
| Defendant-Appellant, | § | No. 515, 2013 |
| | § | |
| | § | Court Below: Superior Court |
| v. | § | of the State of Delaware |
| | § | in and for New Castle County |
| MICHAEL LESH, M.D., and | § | C.A. No. 05C-05-218-CLS |
| ERIK VAN DER BURG, acting | § | |
| jointly as the Shareholder Repres- | § | |
| sentatives for former shareholders | § | |
| of Appriva Medical, Inc., | § | |
| | § | |
| Plaintiffs-Appellees. | § | |

Submitted: September 10, 2014
Decided: September 30, 2014
Revised: April 20, 2015

Before **STRINE**, Chief Justice, **HOLLAND**, and **RIDGELY**, Justices; and **LASTER** and **GLASSCOCK**, Vice Chancellors,[*] constituting the Court *en Banc*.

Upon appeal from the Superior Court. **REVERSED**.

Matt Neiderman, Esquire, Gary W. Lipkin, Esquire, Benjamin A. Smyth, Esquire, Duane Morris LLP, Wilmington, Delaware; Jeffrey J. Bouslog, Esquire, Bret A. Puls, Esquire, Dennis E. Hansen, Esquire, Oppenheimer Wolff & Donnelly LLP, Minneapolis, Minnesota; Theodore B. Olson, Esquire, Gibson, Dunn & Crutcher LLP, Washington, District of Columbia; Christopher D. Dusseault, Esquire, Joshua S. Lipshutz, Esquire, Michael Holecek, Esquire, Gibson, Dunn & Crutcher LLP, Los Angeles, California, for Appellant.

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

Jon E. Abramczyk, Esquire, Matthew R. Clark, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Robert A. Goodin, Esquire, Francine T. Radford, Esquire, Goodin, MacBride, Squeri, Day & Lamprey LLP, San Francisco, California; Jay P. Lefkowitz, Esquire, Joseph Serino, Jr., Esquire, Eric F. Leon, Esquire, John Del Monaco, Esquire, Kirkland & Ellis LLP, New York, New York;  John C. O'Quinn, Esquire, Bob Allen, Esquire, Kirkland & Ellis LLP, Washington, District of Columbia, for Appellees.

**STRINE**, Chief Justice:

# I. INTRODUCTION

This is an appeal from a jury verdict finding that ev3, Inc., the buyer of Appriva Medical, Inc. ("Appriva"), breached its contractual obligations to Appriva's former shareholders, who gave up their shares in the merger. The merger agreement between ev3 and Appriva ("merger agreement") provided for the bulk of the payments to the Appriva shareholders to be contingent upon the timely accomplishment of certain milestones toward the approval and marketability of a medical device that Appriva was developing.

After it became clear that the milestones were not going to be achieved, the former Appriva shareholders sued. Although the case was pursued by former shareholders of Appriva, for simplicity we refer to the plaintiffs as Appriva. Appriva argued that the full amount of contingency payments was due because ev3 had breached its obligation under § 9.6 of the merger agreement to fund and pursue the regulatory milestones in its "sole discretion, to be exercised in good faith."[1] But instead of confining itself to that argument, Appriva also contended that ev3 had breached a provision of a non-binding letter of intent that had been signed by the parties early in their negotiations. That non-binding provision stated that ev3 "will commit to funding based on the projections prepared by its management to ensure that there is sufficient capital to achieve the performance milestones" (the "Funding Provision").[2]

---

[1] Merger Agreement, § 9.6, App. to Opening Br. at 790.
[2] Letter of Intent dated May 22, 2002, App. to Opening Br. at 827.

Because the merger agreement contained an integration clause stating that the letter of intent was not superseded by the merger agreement, the Superior Court accepted Appriva's argument that the letter of intent was not inadmissible parol evidence, but a part of the entire agreement between the parties. At the same time, the Superior Court excluded evidence of the negotiating process that demonstrated that § 9.6's final language was the product of ev3's rejection of Appriva's attempt to turn the non-binding Funding Provision into a binding contractual obligation.

At many points during the trial, ev3 attempted to convince the Superior Court that the non-binding letter of intent should not be used to interpret or contradict the clear terms of § 9.6, but the Superior Court adhered to the contrary view advocated by Appriva. Thus, Appriva was permitted to argue to the jury that ev3 not only failed to act in good faith under § 9.6, but that it breached a "promise" to honor the Funding Provision contained in the non-binding letter of intent. The jury agreed that ev3 had breached its contractual obligations and determined that ev3 owed Appriva the full amount of the milestone payments, $175 million.

On appeal, ev3 argues that the Superior Court, in various related ways, erred by permitting Appriva to argue that the Funding Provision in the non-binding letter of intent continued to bind ev3, and also that the non-binding letter of intent modified the "sole discretion" standard set forth in § 9.6. We conclude that the Superior Court erred by accepting Appriva's position that the non-binding Funding Provision within the letter of intent was admissible to affect the meaning of § 9.6. By its clear terms, § 9.6 overrode

2

any "provision to the contrary." Even more specifically, it made clear that the sole discretion given to the buyer extended to the obligation to "provide funding for the surviving corporation, including without limitation funding to pursue achievement of any of the Milestones." These clear terms negated Appriva's contention that the Funding Provision in the letter of intent was binding and that it tempered ev3's obligation to act in good faith.

Moreover, the integration clause does not aid Appriva for two reasons. First, the letter of intent contained binding and non-binding commitments. To find that the non-binding Funding Provision became binding because the letter of intent was not wholly superseded by the merger agreement would set a precedent that would undermine parties' ability to negotiate and shape commercial agreements.[3] Delaware law is clear that parties should not be bound by terms other than those they ultimately assent to in a complete

---

[3] Delaware courts seek to ensure freedom of contract and promote clarity in the law in order to facilitate commerce. *See Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *6 (Del. Ch. July 23, 2010) ("Delaware law respects the freedom of parties in commerce to strike bargains and honors and enforces those bargains as plainly written."); *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1059-60 (Del. Ch. 2006) ("There is . . . a strong American tradition of freedom of contract, and that tradition is especially strong in our State, which prides itself on having commercial laws that are efficient."); *Libeau v. Fox*, 880 A.2d 1049, 1056-57 (Del. Ch. 2005), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."); *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 712 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004) (observing "Delaware law's goal of promoting reliable and efficient corporate and commercial laws").

agreement, particularly when express language indicates that a previous understanding is preliminary and non-binding.[4]

Second, by its plain terms, § 9.6 overrode any "other provision in the Agreement to the contrary." Thus, whether or not the letter of intent survived for some purposes, any provisions that conflicted with § 9.6 were without force and effect. Because the Funding Provision was inconsistent with § 9.6, it was error for the Superior Court to allow Appriva to argue that the Funding Provision was binding as a promise and that the sole discretion standard in § 9.6 was subject to compliance with or tempered by the Funding Provision. Relatedly, it was also error to allow Appriva to use the Funding Provision as evidence of a binding promise, but to deny ev3 the opportunity to refute this argument with the broader negotiating history.

## II. BACKGROUND[5]

Plaintiffs Dr. Michael Lesh and Erik van der Burg founded Appriva, a California corporation, to develop the "PLAATO" medical device. Before PLAATO could come to market and be sold profitably, Appriva had to run a regulatory gantlet to prove that

---

[4] *See, e.g.*, *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (refusing to imply terms that were inconsistent with, and not supported by, the plain written terms of the contract); *Pharmathene, Inc. v. Siga Techs., Inc.*, 2011 WL 4390726, at *26 (Del. Ch. Sept. 22, 2011), *rev'd on other grounds*, 67 A.3d 330 (Del. 2013) (declining to enforce the terms of a preliminary agreement that was considered the framework for a future agreement and was ultimately superseded by the future agreement); *VS&A Commc'ns Partners, L.P. v. Palmer Broad. Ltd. P'ship*, 1992 WL 339377, at *10 (Del. Ch. Nov. 16, 1992) (declining to enforce terms in a letter agreement that were expressly non-binding).

[5] These factual details are taken from the record provided by the parties in this appeal.

4

PLAATO's benefits to patients outweighed its risks. It also had to demonstrate PLAATO's commercial potential.

In late 2002, ev3, a medical device company primarily financed by private equity funds sponsored by Warburg Pincus and The Vertical Group, made an unsolicited offer to purchase the equity of Appriva for $190 million, with $115 million to be paid upfront and the remainder to be paid upon the completion of certain regulatory milestones on the way to PLAATO's approval for sale to the public. But during the course of negotiations, ev3 became concerned about the costs and risks of achieving regulatory approval and bringing PLAATO to market. In light of these risks, ev3 sought to reduce the upfront payment to Appriva and increase the milestone payments.

The parties signed a non-binding letter of intent during the negotiation process. Certain provisions, which addressed confidentiality, transferability, and restrictions on the ability of Appriva to engage in discussions with other potential buyers, were specifically designated as binding.[6] Negotiating parties often expect these types of provisions to remain binding throughout negotiations and for some of them to even persist after the signing of a definitive agreement.[7] For example, during the negotiation

---

[6] *See* LOU R. KLING & EILEEN NUGENT, 6 NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS, § 6.02 n.17 (2011) ("Another, more common practice that also works well is to set out a binding and nonbinding provisions without grouping them in separate parts and to include a general statement that the entire letter is nonbinding, except for certain provisions which are then specifically itemized.") (internal quotations omitted).

[7] *See, e.g.*, *id.* at § 6.02 (2011) ("Any special arrangements between the parties such as a 'no-shop' provision (an agreement on the part of the seller to deal exclusively with the buyer for some period of time), or expense reimbursement provisions, or 'standstill' provisions, pursuant to which a buyer will agree not to purchase the target's stock during the negotiation period (and perhaps for a period thereafter) . . . should be spelled out in the letter of intent; it may be

process, these binding provisions are often prerequisites to the parties' willingness to risk sharing information while exploring a high-stakes deal. After execution of a definitive acquisition agreement, the confidentiality requirement embodied in an earlier agreement often continues to bind the parties, whereas any restrictions on the target's ability to explore other deals tend to be covered by the terms of the definitive acquisition agreement itself.[8]

The parties also specified that the remainder of the letter of intent was non-binding. The non-binding provisions were those most typically associated with a letter of intent. They outlined the preliminary framework for a potential agreement that the parties might ultimately sign after due diligence was completed, negotiations had taken

appropriate to exclude these sorts of provisions from the general nonbinding nature of the letter of intent."); ALAN S. GUTTERMAN, BUSINESS TRANSACTIONS SOLUTIONS § 294:2 (2014) ("Letters of intent may be binding or nonbinding. However, because of the need for flexibility at the preliminary stages of a deal, they usually include both binding and nonbinding provisions. For example, a purchase price provision may be nonbinding to allow for price variations caused by economic conditions arising prior to closing, while a confidentiality provision would be binding throughout the duration of negotiation."); MOD. CORP. CHECKLISTS § 19:23 (2014) ("Note that if any provisions of the letter of intent are intended to be binding – i.e., confidentiality clauses, no-shop provisions, etc. – the letter of intent should explicitly identify which provisions are binding and emphasize that the remainder of the letter of intent is nonbinding."); ROBERT A. FELDMAN & RAYMOND T. NIMMER, DRAFTING EFFECTIVE CONTRACTS § 5.10 ("Express survival clauses (e.g., 'The following sections shall survive termination for any reason: . . .') should be considered whenever the client desires confidentiality, patent indemnity, or other clauses to survive the term of an agreement.").

[8] KLING & NUGENT, 6 NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS, § 6.02 n.17 ("'[t]he letter of intent is divided into two parts: provisions intended not to be binding, and those intended to be binding. The nonbinding provisions consist primarily of the 'deal points' such as a description of the proposed transaction, the purchase price, key ancillary agreements, and important conditions. The binding provisions focus on the regulation of the negotiation process, including access for the buyer to conduct its acquisition review, 'no shop' restrictions and break-up fees, non-disclosure obligations, procedures for making public announcements, payments of the parties' expenses, and termination provisions. The nonbinding and binding portions of the letter of intent are clearly delineated to assist a court in determining the intent of the parties, if that becomes necessary.'") (citation omitted).

place, and the parties could balance all the risks and rewards and embody them in a comprehensive definitive acquisition agreement. Reflecting this, the letter of intent said:

> It is expressly understood that this letter agreement merely sets forth a preliminary statement of intentions with respect to the Contemplated Transaction, . . . [it] does not constitute an obligation binding on ev3. . . . A binding agreement with respect to the Contemplated Transaction will result only from the execution of a definitive agreement with respect thereto and will be entirely subject to the terms and conditions contained therein.[9]

Among the non-binding provisions of the letter of intent was the one we refer to as the Funding Provision. This provision states in full:

> Prior to closing, ev3 shall provide to Appriva a detailed plan describing the operating, funding and strategic plan for the first 12 months after Closing, which will include details about how Appriva and the Appriva employees will be integrated into the ev3 organization. *ev3 will commit to funding based on the projections prepared by its management to ensure that there is sufficient capital to achieve the performance milestones detailed above.*[10]

The record below reflects that after the letter of intent was signed, Appriva attempted to include a binding obligation in the merger agreement that would have required ev3 to commit to a pre-determined business plan detailing a specific funding schedule to meet the relevant milestones.[11] The record also reflects that ev3 rejected this proposal and that Appriva stood down.

---

[9] Letter of Intent dated May 22, 2002, App. to Opening Br. at 827.
[10] Letter of Intent dated May 22, 2002, App. to Opening Br. at 827 (emphasis added).
[11] *See, e.g.*, Draft Merger Agreement dated June 5, 2002, § 9.6, App. to Opening Br. at 170.

In the final merger agreement, ev3 promised to pay $50 million at closing, but the bulk of the potential consideration – $175 million – was made contingent on the timely accomplishment of the following milestones:

> (1) FDA approval of the [Investigational Device Exemption] application and the achievement of certain "Accepted Clinical Outcomes" by January 1, 2005 ($50 million); (2) enrollment of 300 patients in an "International Registry" by January 1, 2008 ($25 million); (3) submission of an application for pre-market approval to the FDA by January 1, 2008 ($50 million); and (4) approval of that application by January 1, 2009 ($50 million).[12]

The merger agreement also contained an integration clause stating that:

> This Agreement contains the entire understanding among the parties hereto with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions, *other than the Letter of Intent, dated March 15, 2002, as amended*. All exhibits and Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.[13]

Thus, the merger agreement superseded all prior agreements and understandings between the parties, except for those contained in the letter of intent. Because, as has been discussed, letters of intent often contain provisions that parties wish to remain binding after the execution of a definition acquisition agreement – such as confidentiality and standstill provisions – this type of integration clause is not unusual.[14] Notably,

---

[12] Merger Agreement, § 4.3, App. to Opening Br. at 755.

[13] Merger Agreement, § 16.9, App. to Opening Br. at 801 (emphasis added).

[14] *See, e.g.*, ROBERT A. ROSEN & DENNIS H. TRACEY, III, SETTLEMENT AGREEMENTS IN COMMERCIAL DISPUTES § 8.04 (2014) ("A matter of particular importance in drafting [an agreement] for a complex business dispute is to ensure that the agreement clearly states whether

8

nothing in the integration clause purports to convert any non-binding provision of the letter of intent into a binding obligation.

The merger agreement also contained a specific provision dealing with the obligation of ev3 to provide funding to pursue achievement of the milestones. That provision – § 9.6 – contained language establishing the discretionary nature of ev3's funding obligation. Section 9.6 was markedly different from and inconsistent with the Funding Provision from the letter of intent, in which ev3 "commit[ed] to funding based on the projections prepared by its management to ensure that there is sufficient capital to achieve the performance milestones." By contrast, § 9.6 stated in pertinent part:

> *Notwithstanding any other provision in the Agreement to the contrary*, from and after the closing, [ev3's] obligation to provide funding for the Surviving Corporation, *including without limitation funding to pursue achievement of any of the Milestones*, shall be at [ev3's] *sole discretion, to be exercised in good faith*.[15]

Shortly after ev3 and Appriva consummated the merger, ev3's ardor to pursue the development of PLAATO waned. For its part, ev3 contended at trial that the development costs of getting regulatory approval for PLAATO ballooned beyond what anyone had believed to be viable. As PLAATO's commercial prospects became less promising, ev3 began to believe that PLAATO was not worthy of the further investment

---

prior agreements among some or all of the settling parties are intended to survive the settlement. To the extent any prior agreement or any portion thereof, is intended to survive, language should be incorporated into the integration clause to effectuate that intent.").

[15] Merger Agreement, § 9.6, App. to Opening Br. at 790.

9

required to secure FDA approval and bring PLAATO to market expeditiously.[16] For its part, Appriva argued that PLAATO had every bit as much potential during the post-merger period as it had before closing, that the development costs had not grown beyond what ev3 knew would be required, and that ev3 simply decided that it would be more profitable to delay development of PLAATO, avoid the milestone payments, and deny Appriva the fair benefit of its bargain.

Although the reasons were hotly disputed at trial, the record shows that ev3 did not expeditiously pursue FDA approval. When the deadline for the first milestone arrived, ev3 had not met it. At that point, former Appriva shareholders brought suit in the Superior Court and made various claims, including a claim for breach of contract. Appriva contended that ev3 had breached its contractual duties to fund and pursue achievement of the milestone payments "in good faith."

As the case proceeded, the parties dueled over the contours of Appriva's contractual claim. Both sides agreed that § 9.6 was clear and unambiguous, although they had different views about what that meant. In the context of a ruling that denied ev3's motion for summary judgment, the Superior Court agreed that § 9.6 was clear and unambiguous. After the Superior Court made this ruling, ev3 sought to prevent Appriva from arguing to the jury that the non-binding Funding Provision was a contractual

---

[16] After the merger, ev3 appears to have managed PLAATO – which was Appriva's only asset – as a product line. According to ev3, after the merger, ev3 spent $27 million dollars developing PLAATO as a separate product line before selling PLAATO's IP rights to a competitor for only $6 million dollars. App. to Opening Br. at 388; 460.

promise, or that it operated to temper the sole discretion standard in § 9.6. ev3's efforts took the form of a motion *in limine*, proposed jury instructions, and arguments to the Superior Court about the admissibility of evidence at trial.[17] Appriva countered all these attempts, arguing that the integration clause of the merger agreement had excluded the letter of intent, thereby demonstrating that the entire letter of intent, and the Funding Provision in particular, was part of the understanding of the parties regarding the subject matter of the merger agreement and was thus incorporated in it and not inadmissible parol

[17] The parties disputed the meaning of § 9.6 throughout trial, and the Superior Court consistently allowed Appriva to use the letter of intent to interpret § 9.6 over ev3's objections. For example, in advance of trial, ev3 filed a motion *in limine* "To Exclude Evidence of the Non-Binding 'Funding to Projections' Portion of the Letter of Intent." In that motion, ev3 noted that Appriva had argued that the Funding Provision was binding on ev3 because the letter of intent had been incorporated into the merger agreement. App. to Opening Br. at 190-93. The Superior Court denied ev3's motion and accepted Appriva's position that the letter of intent was not parol evidence and could be used affirmatively at trial. At other points during the trial, ev3 objected to certain demonstratives used and testimony elicited by Appriva on the grounds that Appriva was attempting "to show that [the letter of intent] alters the meaning of Section 9.6." These objections were overruled. App. to Opening Br. at 217-18; App. to Reply Br. at 6-12.

     ev3 also filed a "Motion For a Jury Instruction on the Impact of the Letter of Intent On the Meaning of Section 9.6 of the Merger Agreement," which asked the jury to set aside the letter of intent when interpreting § 9.6. App. to Opening Br. at 332. The Superior Court did not rule on this instruction, nor did it give any specific instruction interpreting § 9.6, other than an instruction that defined "good faith." Although Appriva argues on appeal that ev3 waived its request for that jury instruction by not repeating it at the prayer conference, we do not embrace that argument. In its own post-trial decision denying ev3's motion for a new trial, the Superior Court did not find that ev3 had waived its request and instead addressed the merits. *See Lesh v. ev3, Inc.*, 2013 WL 6040418, at *3 (Del. Super. Aug. 29, 2013). That is understandable. ev3 had consistently, and at some risk of testing the Superior Court's patience, pressed its position regarding the admissibility of the letter of intent, and the Superior Court had consistently ruled against it. We will refuse to find waiver "'if the party's position previously has been made clear to the trial judge and it is plain that a further objection would be unavailing.'" *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 439 n.4 (Del. 1996) (quoting WRIGHT & MILLER, 9A FEDERAL PRACTICE AND PROCEDURE § 2553 at 441). At no point did ev3 abandon its position, and any conduct that indicated some acceptance of the court's rulings was necessary to continue the trial. The court had articulated the law governing the case to be put to the jury and ev3 had to deal with that reality until it could challenge the Superior Court's rulings on appeal.

evidence. At the same time, Appriva contended that the negotiating history of the parties from the execution of the letter of intent to the signing of the final merger agreement, particularly involving the ultimate shape of § 9.6, was inadmissible parol evidence. This negotiating history indicated that Appriva had tried to include specific funding commitments in the merger agreement, that ev3 had refused to agree to such terms, and that Appriva lost the point at the negotiating table. Nonetheless, the Superior Court consistently accepted Appriva's position and allowed Appriva to introduce the letter of intent as evidence, while also precluding ev3 from introducing the rest of the negotiating history.

As the case was presented to the jury, Appriva was permitted to and did argue that the non-binding Funding Provision in the letter of intent was a binding promise that comprised part of the overall agreement of the parties, and thus, a breach of the Funding Provision justified relief. Appriva also argued that the binding "sole discretion" standard in § 9.6 was subject to the specific promise made in the non-binding Funding Provision, and thus, ev3 had not acted in good faith when it did not comply with the Funding Provision.

For example, on the first day of trial, Appriva told the jury, "[y]ou're going to have to interpret the contract however you read it . . . Can ev3 really make all of these *promises* about good faith and *ensuring adequate funds* . . . and then take all of that away with the phrase 'sole discretion'. . . ? You have to decide that."[18] And in a demonstrative

---

[18] App. to Opening Br. at 250 (emphasis added).

used during its closing argument to the jury, Appriva stated that "ev3's breach in a nutshell" included "**NOT** 'ensur[ing] . . . sufficient capital to achieve the performance milestones.'"[19]

Consistent with this, Appriva argued in closing that the Funding Provision in the letter of intent contained a binding promise:

> *In the letter of intent, what did ev3 promise? They promised Appriva that they would [e]nsure – it is a pretty strong word, [e]nsure – that there is sufficient capital to achieve the performance milestones detailed above. That was one of the promises they made in the contract. That wasn't the only promise.* 9.6, they told us they would fund and pursue the milestones in good faith. . . . What that says is that ev3 has sole discretion when it comes to choosing the way in which they go about funding and pursuing the milestones. They don't have sole discretion when it comes to whether they fund or pursue the milestones. When it comes to whether they fund or pursue the milestones, they have to use good faith. . . . You don't have the discretion to decide whether you're going to need to try, if you're going to set aside funds whether you're going to pursue it.[20]

The case ultimately went to the jury, which was asked to decide simply whether ev3 breached the merger agreement. The Superior Court did not instruct the jury that the

---

[19] App. to Opening Br. at 565.

[20] App. to Opening Br. at 481-82 (emphasis added). Appriva made similar arguments at other points during the trial. *See, e.g.*, App. to Opening Br. at 678-79 ("They can't just mothball it when they have an expressed obligation to us to fund it, and to pursue the milestones . . . . You can't sign a contract in July of 2002, that calls for good faith performance all the way out until January 2009, and then shut it down in 2003 . . . because you think you don't like the way the movie is going to end in January 2009. That's not good faith effort. You've got to at least try."); App. to Opening Br. at 229 ("In this letter of intent, look at this language. They said they will, not may, will commit to funding based on the projections prepared by its management – and this is the key phrase – to ensure, to ensure that there is sufficient capital to achieve the performance milestones detailed above. . . . Now I said they put it in a signed writing twice. Here's another one. The contact itself. In the contract itself, at Section 16.9, they said that the letter of intent that we just went over, we'll agree that's part of the contract. We will put that in the agreement.").

integration clause did not convert the non-binding provisions of the letter of intent into binding ones. Nor did the Superior Court instruct the jury that by the plain terms of § 9.6, the Funding Provision had no force and effect, because it was contrary to § 9.6 and § 9.6 prevented the parties from considering contrary provisions.

Instead, the Superior Court provided a single jury instruction interpreting § 9.6. This instruction defined "good faith" and was the subject of debate between the parties. ev3 sought a specific instruction that required the jury to find that ev3 had acted in bad faith in order to breach § 9.6.[21] By contrast, Appriva sought an instruction that defined good faith as "honesty in fact, faithfulness to the purpose of the contract, and behaving in a manner that allows both parties to obtain the benefits for which they contracted."[22] The Superior Court ultimately gave the jury its own instruction, which involved a variety of definitions, including one drawn from the Uniform Commercial Code ("UCC").[23]

Ultimately, the jury found that ev3 had breached its contractual obligations and awarded Appriva $175 million in damages, the full amount of the milestone payments. The jury found for ev3 on all of Appriva's other claims, including its fraud claim. ev3 then filed motions for judgment as a matter of law and a new trial, which were denied by the Superior Court.[24] ev3 then filed this appeal, requesting that we reverse the Superior Court's order denying ev3's motion for a new trial. Among the grounds that ev3 pressed was that the Superior Court erred by allowing Appriva to use the Funding Provision to

---

[21] App. to Opening Br. at 203.
[22] Pl.'s Proposed Jury Instructions, E-File 51799698.
[23] Opening Br. Ex. D.
[24] *Lesh v. ev3, Inc.*, 2013 WL 6040418, at *1 (Del. Super. Aug. 29, 2013).

14

alter the meaning of § 9.6 and strip ev3 of the "sole discretion" for which it had bargained.

The Superior Court rejected that argument for two reasons. First and most important, the Superior Court reiterated its view that the Funding Provision in the letter of intent had been incorporated into the merger agreement, was not in conflict with § 9.6, and thus was not inadmissible parol evidence. The Superior Court also emphasized that the letter of intent had been admitted solely "because [it] related to the representations and reliance required to support Plaintiffs' fraud claim and not to contractual construction."[25]

Second, the Superior Court contended that because the jury did not accept Appriva's fraud claim, there was no harm to ev3 from the omission of evidence showing that Appriva had attempted but failed to incorporate specific obligations to fund achievement of the milestones, similar to the Funding Provision, into the merger agreement.[26]

### III. ANALYSIS

On appeal, ev3 makes several arguments. We focus on the major one, which we distill into its essence. That argument is that the Superior Court erred by permitting Appriva to argue that the non-binding Funding Provision in the letter of intent was in fact binding, either as an independent promise that was part of the parties' overall bargain, or as a limitation on the sole discretion given to ev3 in § 9.6.

---

[25] *Id.* at *4.
[26] *Id.*

We agree. The reference to the letter of intent in the integration clause did not convert the non-binding Funding Provision into a binding contractual obligation.[27] Survival is not transformational. Rather, the integration clause's provision that allowed the letter of intent to survive simply had the effect of ensuring that the expressly binding provisions contained in the letter of intent – which negotiating parties in the merger and acquisition context often expect to survive – would not be extinguished by the integration clause. The letter of intent contained provisions that dealt with subjects such as confidentiality, and stated that those provisions were "fully binding on the parties hereto."[28] The parties would not necessarily have wanted to release each other from these obligations just because they signed a merger agreement.

By contrast, the non-binding provisions of the letter of intent were just that: non-binding. These were the framework provisions that outlined the contours of a potential

---

[27] *See, e.g.*, *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998) ("There is no enforceable contract if the parties do not intend to be bound before a formal written agreement is drafted and signed."); *PharmAthene, Inc.v. SIGA Techs., Inc.*, 2011 WL 4390726 (Del. Ch. Sept. 22, 2011) (nonbinding term sheet did not become binding when it was attached to the merger agreement), *rev'd on other grounds*, 67 A.3d 330 (Del. 2013); *Pauly Petroleum, Inc. v. Cont'l Oil Co.*, 231 A.2d 450, 456 (Del. Ch. 1967) (finding that a provision in an earlier agreement did not bind the parties, even though the binding contract referred to the earlier agreement, because, among other things, the record showed a dispute as to why the provision was omitted from the binding contract, the binding contract was complete and detailed on its face, and the language in the binding contract was general as to the earlier agreement and did not show an intent to incorporate the details of the earlier agreement), *aff'd* 239 A.2d 629 (Del. 1968); 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 3.5 (4th ed. 2003) ("[I]f the parties to an agreement specifically provide that no legal obligation is thereby created, that provision will be respected by the law. . . .").
[28] Letter of Intent dated May 22, 2002, App. to Opening Br. at 827.

16

deal that the parties might ultimately strike contractually in a binding form.[29]  But whether the parties would ultimately strike such a deal would be determined by their comfort level following due diligence and whether they could reach an overall bargain. Taking care to ensure that non-binding meant non-binding, the drafters of the letter of intent said:

> It is expressly understood that this letter agreement merely sets forth a preliminary statement of intentions with respect to the Contemplated Transaction. . . .  A binding agreement with respect to the Contemplated Transaction will result only from the execution of a definitive agreement with respect thereto and will be entirely subject to the terms and conditions contained therein.[30]

The fact that the parties designated certain provisions of the letter of intent as binding confirms that the remainder of the letter of intent, including the Funding Provision, was non-binding.[31]

As important, § 9.6 starts with the plain words: "Notwithstanding any other provision in the Agreement to the contrary."  These words render ineffective any contrary provision in the merger agreement itself, otherwise binding or not, and thus, even if the letter of intent had been incorporated as part of the parties' larger agreement, any provisions of the letter of intent in conflict with § 9.6 must give way.

---

[29] *See* MOD. CORP. CHECKLISTS § 19:23 (2014) ("Since letters of intent are ordinarily seen as preliminary agreements – i.e., agreements to agree – parties generally intend that the letter of intent be nonbinding. . . .  The court . . . will examine several factors as evidence of such intent. The most important of these factors is the presence of clear and unambiguous language expressly stating that the letter of intent is not intended to constitute a binding obligation. . . .").

[30] Letter of Intent dated May 22, 2002, App. to Opening Br. at 827.

[31] *See* KLING & NUGENT, 6 NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS, § 6.02 n.17 (2011) ("In fact if the parties did not intend to be bound . . . at the time of the letter of intent, it may be particularly helpful in a court's analysis of the parties' intent for the parties to have specifically noted the binding nature of certain provisions.").

Section 9.6 makes clear that the sole discretion given to ev3 extended to the obligation to "provide funding for the surviving corporation, including without limitation funding to pursue achievement of any of the Milestones," subject only to its duty to act in good faith. A provision that allows a buyer to make funding decisions in its "sole discretion" is plainly inconsistent with the Funding Provision, which required ev3 to fund on a specific schedule "to ensure that there is sufficient capital to achieve" the milestones. Accordingly, the non-binding Funding Provision is not only non-binding as a matter of the plain terms of the letter of intent, it is inconsistent with § 9.6, and thus has no force or effect.[32] Based on the clear language of the contract, Appriva should have been prevented from arguing before the jury that the Funding Provision constituted a contractual promise in itself, or was binding in the sense that it was a condition on ev3's sole discretion under § 9.6.

This is not to say that the Funding Provision of the letter of intent would necessarily be inadmissible for all purposes. For example, if ev3 contended that it never understood that the development of PLAATO would involve costs of the magnitude set forth in the Funding Provision of the letter of intent and the separate plan it referenced,

---

[32] "An earlier agreement may help the interpretation of a later one, but it may not contradict a binding later integrated agreement. Whether there is contradiction depends . . . on whether the two are consistent or inconsistent." RESTATEMENT (SECOND) OF CONTRACTS § 215 (1981). *See also* Ferdinand S. Tinio, *The Parol Evidence Rule and Admissibility of Extrinsic Evidence to Establish and Clarify Ambiguity in Written Contract*, 40 A.L.R.3d 1384 (1971) ("Whether or not parol evidence is admissible only if the agreement is ambiguous, there seems to be wide acceptance of the principle that such evidence should only clarify or explain, but not vary or contradict, the terms of the contract.").

the terms of the letter of intent itself would be admissible to contradict that assertion.[33] But even in that context, it would be incumbent on the Superior Court to ensure that the jury understood the purpose for which the letter of intent were being used, and to restrict the jury to that use with a clear limiting instruction stating that the letter of intent was non-binding and any conflicting provision in the letter of intent could not alter the meaning of § 9.6.

As the trial actually proceeded, Appriva did not use the Funding Provision in any such targeted way. Instead, it made broad arguments that the non-binding Funding Provision was in fact binding, in the sense that it had independent force, and also that it tempered the sole discretion given to ev3 in § 9.6. The Superior Court erred by permitting Appriva to make these arguments. That error was compounded because ev3 was denied the opportunity to admit evidence of the parties' negotiations that arguably would have demonstrated that Appriva knew that ev3 had not promised to abide by the Funding Provision, and that Appriva was knowingly asking the jury to embrace a false proposition.

Because Appriva was permitted to argue that ev3 was bound by two separate promises, the breach found by the jury could have involved a breach of § 9.6 or a breach of the Funding Provision. As for the breach of § 9.6, the jury may have improperly relied on the non-binding Funding Provision when determining that ev3 did not act in good faith. On this point, the Superior Court's determination that there was no prejudice to

---

[33] In such a case, the letter of intent could be used as evidence to rebut this argument, but not to contradict the plain terms of § 9.6 of the merger agreement.

ev3 because the Funding Provision was relevant only to a fraud claim on which ev3 prevailed was clearly erroneous. As we have noted, Appriva repeatedly argued that the Funding Provision was a binding promise that ev3 breached, which should subject ev3 to contractual damages. Because the jury was therefore permitted to hold ev3 responsible for breaching the contract on theories that are inconsistent with the unambiguous terms of the parties' agreement, we reverse and remand the case for a new trial.[34]

Because a new trial must be held on the breach of contract claim, we do not reach ev3's argument on appeal that the Superior Court's jury instruction regarding the meaning of good faith was erroneous. When the Superior Court crafted its instruction, it did not have the benefit of this Court's decision in *DV Realty Advisors LLC v. Policemen's Annuity and Benefit Fund of Chicago*.[35] In that case, we held that when a trial court is addressing an express contractual provision requiring the exercise of good faith, it must focus the breach inquiry on whether the party bound by the provision had acted in subjective bad faith based on the circumstances existing at the time of its alleged breach, within the context defined by the terms of the parties' contractual bargain.[36] Accordingly, when a contract's express terms incorporate a good faith requirement, the trial court should focus on the meaning of that express contractual duty. We noted that a trial court must avoid conflating the standard for breach of an express contractual duty to

---

[34] *See, e.g.*, *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436 (Del. 1996) (ordering a new trial because the trial court's overbroad jury instruction on the implied covenant of good faith included improper bases for liability).

[35] 75 A.3d 101 (Del. 2013).

[36] *Id.* at 109-11 (determining that the contract's express requirement to act in good faith must be analyzed in the context of the agreement's "overall scheme").

exercise good faith with the implied covenant of good faith and fair dealing, which acts as a check on the behavior of contracting parties and must be used cautiously.[37]

In *DV Realty*, we also held that a plaintiff contending that a party did not comply with its express contractual duty of good faith would typically have to show that the party acted in *subjective* bad faith.[38] Thus, in the course of upholding a judgment by the Court of Chancery, this Court indicated that the Court of Chancery had nonetheless erred by defining an express obligation of good faith by reference to the UCC. Instead of the Court of Chancery using a generic definition of good faith drawn from the UCC, a definition the parties did not select, this Court held that the Court of Chancery should have interpreted the contractual good faith requirement in the context of the parties' contractual bargain.[39] *DV Realty* indicates an appropriate instruction would have defined good faith by its "opposite characteristic—bad faith."[40]

We believe it would be imprudent to accept ev3's invitation for us to craft specific jury instructions for use on remand. The record is clear that the Superior Court

---

[37] *Id.* at 108.

[38] We first noted that "the proper good faith standard called for by [the agreement] is purely subjective." *Id.* at 110. We then explained that it is often helpful to define good faith as the absence of bad faith: "Good faith and bad faith are illustrative examples of opposite characteristics . . . in that each is used in more than one sense and thereby informs our understanding of each other." *Id.*

[39] *Id.* at 111 ("The proper good faith standard called for by [the agreement] is purely subjective. Therefore, the Court of Chancery ruled incorrectly that 'good faith' as used in the [agreement], includes both subjective good faith – 'honesty in fact' – and an element of objectivity – 'reasonable commercial standards of fair dealing' as provided in the UCC. Nevertheless, applying the subjective standard of good faith to the evidence in the record, we hold that the Court of Chancery properly concluded that the Limited Partners met the contractual standard for removal [in good faith].").

[40] *Id.* at 110.

conscientiously devoted itself to the consideration of the complicated issues presented to it by the parties in this difficult case. With the benefit of briefing by the parties on the relevance of *DV Realty* and the clarity that this decision has provided regarding the non-binding nature of the letter of intent, the Superior Court, with its greater knowledge of the factual record of the case, will be best positioned to craft case-specific instructions that give the jury appropriate guidance regarding their obligation to find for Appriva only if they are convinced that ev3 acted in subjective bad faith. In crafting these instructions, the Superior Court should, however, focus on defining bad faith, within the precise context of the contractual bargain, such as if ev3 purposely delayed meeting a milestone solely to avoid making the corresponding payment to Appriva.[41]

We recognize that this task is not without complexity. ev3 agreed to pay the milestones on a shared assumption with Appriva that the development of PLAATO would generate profits sufficient to make its development worthwhile to ev3 after considering PLAATO's development costs and risks and the milestone payments. That is, that the timely development was expected to be a win-win proposition for ev3 and Appriva.[42] When it would be bad faith under a sole discretion standard for ev3 to decide that it was not worthwhile to pursue PLAATO on a time frame consistent with the timely

---

[41] *See, e.g.*, *Winshall v. Viacom Intern., Inc.*, 55 A.3d 629 (Del. Ch. 2011), *aff'd*, 76 A.3d 808 (Del. 2013).

[42] According to the Appriva shareholders, "[g]iven PLAATO's promising test results, the millions of individuals at risk of stroke due to atrial fibrillation, and the dearth of alternative treatments, PLAATO had the potential to become a multi-billion dollar device." Answering Br. at 5. The record also contains evidence that ev3 had expected PLAATO to be highly profitable. For example, in a presentation dated January 13, 2005, ev3 stated that the "potential market in dollars" for PLAATO was greater than 3 billion dollars. App. to Answering Br. at 318.

achievement of a milestone is difficult to define in the abstract. From past cases, however, one relevant example emerges. In *Winshall v. Viacom Intern., Inc.*, the selling shareholders argued that the buyer had breached the implied covenant of good faith and fair dealing by failing to take discretionary action that would have maximized earn-out payments to the selling shareholders.[43] Because the conduct the selling shareholders complained about involved the potential profits for a product in which the selling shareholders had no contractual expectation, and the buyer did not take any action to reduce the earn-out payments that the selling shareholders could have reasonably expected, the Court of Chancery found for the buyer. In so finding, the court quoted this Court's statement in *Nemec v. Shrader* that "[a] party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply limits advantages to another party."[44] In finding for the buyer, the Court of Chancery contrasted the situation before it with one where "an acquirer . . . promises earn-out payments to the sellers of the target business and then purposefully pushes revenues out of the earn-out period."[45]

In this case, the transaction was structured around an assumption that both sides would win if PLAATO turned out to be a profitable product. Appriva would win because it would get $175 million in milestone payments. ev3 would win because it would reap

---

[43] 55 A.3d at 634.

[44] *Id.* at 638 (internal quotations omitted).

[45] *Id.* (holding that the buyer breached implied covenant of good faith and fair dealing where sellers' earn out was based on revenues from any contracts entered within six years of closing and the buyer deliberately delayed entering into revenue-generating contracts so that it could avoid earn-out payments).

profits justifying the full acquisition costs of acquiring PLAATO ($50 million plus the $175 million in milestone payments) plus the costs and risks of developing PLAATO and bringing it to market.

Under *DV Realty*, it could therefore not constitute bad faith for ev3 to refuse to proceed with PLAATO if the pursuit, after taking into account the milestones and development costs, was not expected to yield ev3 a commercially reasonable profit, in the context of the industry within which it was operating. But it could be bad faith if the expected profits to ev3 were commercially reasonable and ev3 nonetheless acted to delay accomplishment of the milestones so as to shift additional profits its way at the expense of the former Appriva shareholders. The Superior Court, with further input from the parties and greater knowledge of the factual record, is best positioned to give a specific instruction to the jury at the new trial.

For these reasons, the Superior Court's final judgment order denying the motion for a new trial is REVERSED, and the case is remanded for proceedings consistent with this opinion.[46]

---

[46] On appeal, ev3 also argues that the merger agreement's terms should have precluded Appriva from asserting a fraud claim. Because the jury found for ev3 on the fraud claim, and Appriva has not appealed that adverse jury verdict, we have no reason to reach this argument. On remand, the only claim open for a new trial is ev3's breach of contract claim.