273 So.2d 630 (1973)
ALCO-COLUMBIA PAPER SERVICE, INC.
v.
Louis James NASH.
No. 5237.
Court of Appeal of Louisiana, Fourth Circuit.
February 6, 1973.
Rehearing Denied March 13, 1973.
William M. Barnett, Guste, Barnett & Colomb, New Orleans, for plaintiff-defendant in reconvention, appellant.
Joseph S. Russo, New Orleans, for defendant-plaintiff in reconvention, third-party plaintiff-appellee.
*631 Herschel L. Abbott, Jr., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for third-party defendant-appellant.
Before REGAN, SAMUEL and REDMANN, JJ.
REGAN, Judge.
Plaintiff, Alco-Columbia Paper Service, Inc., filed this suit against the defendant, Louis J. Nash, a former employee, endeavoring to recover an advance of $800.00 which the defendant failed to repay.[1]
The defendant answered, denying the validity of the claim. He explained that his obligation to repay the advance was conditioned upon his earning commissions in excess of $800.00 per month and then only the excess would be applied to repay his employer. He further asserted that after the loan was made his commissions never reached the sum of $800.00 per month.
Defendant then reconvened, claiming that the plaintiff was obligated to render him an accounting of sales and unpaid commissions due thereon for the period beginning January 1, 1970 through September 30, 1970 and to pay him this amount.
Then, assuming the position of third party plaintiff, Nash impleaded the Alco-Columbia Profit Sharing Plan. The third party defendant is a corporation charged with administering a profit-sharing plan for the plaintiff's employees. Nash asserted that the trustees of the third party defendant were withholding approximately $700.00 in which he had acquired a vested interest during his years of employment with the plaintiff corporation.
The defense is that under the terms of the profit sharing agreement, any participant who terminated his employment with the plaintiff corporation in order to work for a competitor forfeited any interest in the plan and this was what Nash actually did.
From a judgment dismissing plaintiff's suit, awarding defendant $589.50 on his reconventional demand; and awarding Nash 50% of the sum credited to his account in the profit sharing plan, both plaintiff and the third party defendant have appealed.
The record reveals that the defendant began his employment as a salesman with Columbia Paper Company in May of 1964. In 1967 through a merger, plaintiff became Alco-Columbia Paper Service, Inc. In July 1969, this corporation was bought by Consolidated Marketing, Inc. When the company changed hands, the new management advised defendant and the other salesmen that no changes would be made. However, in December of 1969, the new owner announced several policy changes effective January 1, 1970, namely, (1) Accounts would be reassigned and some on which the salesmen had previously been paid commissions would become house accounts; (2) All salesmen were guaranteed a minimum wage in 1970 equivalent to their 1969 earnings; (3) As of January 1, 1971 the minimum wage guarantee was out and the earnings would be limited to commissions earned; and (4) Salaries would be paid on a monthly basis as opposed to the weekly basis used before.
To alleviate the financial burden the change in pay periods would occasion during the transitional period, plaintiff advanced to defendant the sum of $800.00 in January of 1970. From the testimony it is apparent that the plaintiff made it clear that the $800.00 was to be repaid; however, the time when repayment was due was indefinite. This was established by Byron Levy, plaintiff's president, and Jack May, one of defendant's witnesses. May had been employed in a managerial capacity with plaintiff when the loan was made, *632 but at the time of the trial, he was general manager for one of plaintiff's competitors.
In July of 1970, William Whittle, a new manager was engaged by the plaintiff. According to the defendant, Whittle told him that his sales had declined and effective October 1, 1970 the wage guarantee was no longer in effect and his draw per month would be reduced from $800.00 to $600.00. As Whittle relates what transpired, he was unaware of the guarantee when he first talked to the defendant but promised to check with his superiors and let him know.
On September 20, 1970 defendant made a commitment to work for Schneider Paper Products, one of plaintiff's competitors. He was to assume his new employment on October 1, 1970. It is of significance to note that at the time defendant agreed to work for Schneider he was still under the impression that his monthly draw would be reduced to $600.00 and that the 1970 guaranteed wage agreement was cancelled as of October 1, 1970. Whittle testified that he advised defendant during the last week of September that the company would honor its commitment for a guaranteed wage for the balance of the year; however, by this time, defendant had obtained new employment.
The record does not explain why Whittle required two months to learn what the company's policy was with respect to defendant and communicate the information to him.
As to actual earnings, defendant averaged $885.63 per month in 1970 as opposed to $909.35 per month in 1969. We arrived at these figures by dividing gross income for each year by the number of months worked. ($10,912.22 divided by 12 for 1969 and $7,970.74 by 9 for 1970.)
Predicated upon the foregoing factual finding, we will initially determine whether the trial court properly dismissed plaintiff's demand. The lower court's decree is based on a finding that the defendant's obligation to repay was conditioned upon his earning more than $800.00 per month in commissions. Although the record does not support this finding we are of the opinion that this fact is not determinative. The record clearly discloses, even through the testimony of the defendant's witness, that he was expected to repay the $800.00 advanced. The only indefinite aspect of the loan agreement was time when repayment was due. That the advance was intended as a loan is further corroborated by the fact that the employer did not include the $800.00 as wages in the 1970 withholding statement it furnished to the defendant and avail itself of an additional tax deduction in reporting this item as a business expense.
The law applicable is not disputed. Both litigants have referred us to cases reciting the jurisprudential rule that advances made to salemen against future commissions to be earned are loans imposing on the recipient the obligation to repay only when there is an express or implied understanding that repayment is due at the time the advance or loan is made.[2]
Thus, with respect to the plaintiff's original demand, we reverse the lower court on a factual finding that the advance was an unconditional loan which carried with it the obligation to repay. This is so since it was made clear to the defendant that the $800.00 was to be repaid and was simply a loan to alleviate financial difficulties while the plaintiff corporation changed its payroll procedure from a weekly to a monthly distribution.
The award to plaintiff on the main demand is subject to an offset in view of the wage guarantee that the plaintiff made to defendant in December of 1969. Defendant earned $23.72 per month less in 1970 than he did in 1969. ($909.35 - $885.63 = $23.72). Therefore, over a nine month *633 period the wages actually paid to him were $213.48 less than the amount guaranteed. ($23.72 × 9 = $213.48). Defendant testified that part of the earnings reported for 1970 included a commission of more than $400.00 actually earned in 1969 that he did not receive until February 1970. He argues his gross income for 1970 must be computed by first deducting the 1969 commissions and then dividing the reduced amount by the number of months worked. The fallacy in this position is that he used a 1968 carryover paid to him in 1969 to compute his average monthly income for 1969. Thus if he expected to take advantage of the 1969 carryover to reduce his 1970 average wage, he must also deduct the 1968 carryover in reporting his 1969 average monthly wage. This he has failed to do.
Accordingly we find that rather than awarding defendant any amount he claimed for unpaid wages or commissions on the reconventional demand, the lower court should have allowed defendant an offset of $213.48 against the $800.00 he was obligated to pay plaintiff. In other words plaintiff's net recovery on the principal would amount to the sum of $586.52.
Finally we turn our attention to that part of the judgment ordering third-party defendant to pay Nash 50% of the amount credited to his account in the profit sharing plan. According to a formula set forth in the plan, this amount became vested in the defendant because of the tenure of his employment with plaintiff.
The trustees adopt the position that the defendant forfeited any right to profit sharing funds by accepting employment in another firm in direct competition with plaintiff. Its refusal to pay the funds is based on the quoted section of the plan that was in effect and was a policy of the plan when defendant became a member.
"If, after retirement, resignation or other termination of employment a Participant is employed by or becomes associated with any person, firm or corporation in the States of Louisiana, Mississippi or Alabama in direct competition with the Company the Committee may, in its discretion, direct the Trustee to cease paying benefits to such Participant and any and all of such Participant's interests in and under the Plan or Trust * * * shall immediately cease and be forfeited."
In adopting the position which they did, the Trustees of the third party defendant exercised the discretion vested in them by virtue of the above quoted section of the plan. The funds held in trust are the property of the plaintiff's employees. However, the loss to the defendant was not caused by the trustees or the participants in the fund. Defendant's loss was caused by the action of plaintiff's agent Whittle. We are convinced that Whittle's inaction in determining defendant's position salarywise for the last quarter of 1970 was the cause of his seeking other employment. When defendant acted, he had every reason to anticipate that the annual wage guarantee for 1970 would be breached.
Thus defendant's loss of accrued rights in the profit sharing plan was caused by the plaintiff's agent Whittle and defendant here seeks reimbursement from the wrong party.
Defendant argues his interest in the plan has become a vested property right that cannot be denied by the trustees. He relies on the holding in Laffitte v. Laffitte[3] to the effect that a 100% vested interest in a profit sharing plan was a vested property right. In that case, the husband resisted his wife's demand that the profit sharing plan account be partitioned as a community asset. He argued that while the amount was credited to his account he had not been paid and would not be given this sum until his retirement. The Court pointed out he could collect a sum certain by simply retiring, an act completely *634 within his control. It is interesting to note that the plan had a forfeiture provision; however, its validity was not at issue. In view of the fact that the forfeiture provision was not disputed or discussed, we believe that Lafitte is distinguishable and therefore the rationale emanating therefrom is not binding on this court. The forfeiture provision was one of the conditions to which the defendant agreed when he entered the plan. We are convinced that he is bound by it.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered that there be judgment in favor of the plaintiff and against the defendant in the amount of $586.52. The reconventional demand and the third party petition are hereby dismissed. Defendant is to pay all costs incurred herein.
Reversed and rendered.
REDMANN, Judge (dissenting in part).
I agree that the $800 was a loan. Plaintiff did guarantee 1970 earnings would equal 1969 earnings, but not that 1970 would exceed 1969 by $800.
But it seems undisputed that, after the change in account assignments, defendant was guaranteed that his earnings for 1970 would not be less than those for 1969. Plaintiff's president testified that (1) defendant's 1969 "actual earned commissions" were $10,854.04 and (2) defendant's 1970 income through September of $7,970.74 included $419.74 "commissions which were earned in 1969" (i.e. were part of the $10,854.04). Thus (1) defendant's average monthly earnings in 1969 were $904.50 and (2) his earnings in the nine months of 1970 totalled $7,551 or a monthly average of $839. Plaintiff's guarantee of earnings thus entitled defendant to $589.50.
Thus judgment for plaintiff should be for $210.50, at plaintiff's cost.
On defendant's third-party demand (ignoring whether it should have been permitted; see C.C.P. art. 1111), the trial court's judgment in his favor was correct.[1]
The "profit-sharing retirement plan" provides that its advisory "committee may, in its discretion" forfeit the "vested" interest of a retired or terminated employee who accepts employment with a competitor. This language, with no guidelines provided, purports to leave it to the committee's whim or caprice whether to pay the "vested" interests to a former employee in defendant's position. Even a mandatory forfeiture would be null under R.S. 23:921 as an agreement not to compete (disguised in form as an alternative agreement to either not-compete or forfeit). Discretionary forfeiture is doubly offensive because it leaves it to the wish of a committee (appointed by the employer) whether or not one may compete without penalty. Compare Martinez v. Alto Employees Trust, 273 So.2d 735 (La.App.1973).
NOTES
[1] In its petition plaintiff alleged defendant owed a total of $1,033.64 but reduced its claim to $1,000.00 in order to fall within the jurisdiction of the First City Court. At the trial, plaintiff limited its claim to the $800.00 loan hereinabove described.
[2] Lawton v. Scott, La.App., 29 So.2d 614 (1947); Grace v. Morales, La.App., 210 So.2d 60 (1968).
[3] La.App., 232 So.2d 92 (1970).
[1] Defendant, if successful in his attack on discretionary forfeiture-by-competition, ought not benefit from such forfeitures by others. However, the amount of defendant's benefit from the forfeitures in evidence is not shown.