# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CANTOR FITZGERALD, L.P., A Delaware limited partnership, | § § § § § § § § § § § § § § § § § | No. 162, 2023 |
| Defendant Below, Appellant, | | Court Below: Court of Chancery of the State of Delaware |
| v. | | C.A. No. 9436 |
| BRAD AINSLIE, JASON BOYER, CHRISTOPHE CORNAIRE, JOHN KIRLEY, ANGELINA KWAN, and REMY SERVANT, | | |
| Plaintiffs Below, Appellee. | | |

Submitted: November 1, 2023
Decided: January 29, 2024

Before **SEITZ**, Chief Justice; **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices and **JURDEN**, President Judge[1] constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **REVERSED and REMANDED.**

C. Barr Flinn, Esquire, Paul J. Loughman, Esquire, Alberto E. Chávez, Esquire, Skyler A. C. Speed, Esquire, YOUNG, CONAWAY, STARGATT & TAYLOR, LLP, Wilmington, Delaware; David A. Paul, Esquire (*argued*), Virginia J. Cardenas, Esquire, Sid Nadkarni, Esquire, CANTOR FITZGERALD, New York, New York, *for Appellant Cantor Fitzgerald, L.P.*

Blake A. Bennett, Esquire, COOCH & TAYLOR P.A., Wilmington, Delaware; Kyle W. Roche, Esquire (*argued*) KYLE ROCHE P.A., New York, New York; Velvel Freedman, Esquire, Alex Potter, Esquire, FREEDMAN NORMAND FRIEDLAND

---

[1] Sitting by designation under Del. Const. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

LLP, New York, New York, *for Appellees Brad Ainslie, Jason Boyer, Christophe Cornaire, John Kirley, Angelina Kwan and Remy Servant.*

Richard L. Renck, Esquire, DUANE MORRIS LLP, Wilmington, Delaware; Robert M. Palumbos, Esquire, Ryan F. Monahan, Esquire, DUANE MORRIS LLP, Philadelphia, Pennsylvania; Jordan L. Von Bokern, Esquire, Tyler S. Badgley, Esquire, U.S. Chamber of Commerce, Washington, DC, *for the United States of America, Delaware State Chamber of Commerce, Managed Funds Association, and Securities Industry and Financial Markets Association amici curiae in support of Appellant.*

Michael L. Vild, Esquire, David G. Holmes, Esquire, CROSS & SIMON, LLC, Wilmington, Delaware; Kenneth W. Gage, Esquire, Dan Richards, Esquire, PAUL HASTINGS LLP, New York, New York; Corey L. Andrews, Esquire, John M. Masslon, II, Esquire, WASHINGTON LEGAL FOUNDATION, Washington, DC, *for Washington Legal Foundation amicus curiae in support of the Appellant.*

Anthony A. Rickey, Esquire, MARGAVE LAW LLC, Wilmington, Delaware; Eric A. Posner, Esquire, *for Small Business Majority in support of the Appellee.*

**TRAYNOR**, Justice:

The courts of this State hold freedom of contract in high—some might say, reverential—regard. Only "a strong showing that dishonoring [a] contract is required to vindicate a public policy interest even stronger than freedom of contract"[2] will induce our courts to ignore unambiguous contractual undertakings.

This appeal, which concerns the enforceability of the "forfeiture for competition" provisions of a limited partnership agreement, puts this principle to the test. The provisions authorize the partnership to withhold distributions otherwise owed to a partner who withdraws from the partnership if he engages in specified activities in competition with the partnership. The provisions in this case remain operative for four years following a partner's withdrawal and, among the six plaintiffs, resulted in forfeitures ranging from just under $100,000 to over $5 million.

The Court of Chancery recognized that the debate surrounding the enforceability of forfeiture-for-competition devices raises important, and often divergent, policy considerations: policies favoring "enforcing private agreements on [the] one hand, and disfavoring restraints of trade and allowing individuals to freely pursue their profession of choice, on the other."[3] In a thoughtful opinion that draws heavily from our case law governing covenants not to compete, the court concluded

---

[2] *ev3, Inc. v. Lesh*, 103 A.3d 179, 181 n.3 (Del. 2014) (quoting *Libeau v. Fox*, 880 A.2d 1049, 1056 (Del. Ch. 2005), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006)).
[3] *Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924, at *22 (Del. Ch. Jan. 4, 2023) ("Opinion").

that, in this context, our State's interest in protecting competition outweighs our interest in enforcing voluntarily entered contracts. It follows, the court reasoned, that, unlike ordinary contract provisions, forfeiture-for-competition provisions should be subject—much like restrictive employment covenants are—to scrutiny for reasonableness. According to the Court of Chancery, they could not pass this test and are therefore unenforceable.

Under the circumstances of this case, we balance the relevant policy interests differently. When sophisticated actors avail themselves of the contractual flexibility embodied in the Delaware Revised Uniform Limited Partnership Act—a statute that is expressly designed "to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements"[4]—and agree that a departing partner will forfeit a specified benefit should he engage in competition with the partnership, our courts should, absent unconscionability, bad faith, or other extraordinary circumstances, hold them to their agreements. As we have observed, "[p]arties have a right to enter into good and bad contracts[;] the law enforces both."[5] Here, the Court of Chancery erred by imposing its notion of reasonableness on the very provisions that, when enforced against other departing partners, redounded to the plaintiffs' benefit during their tenure as partners.

---

[4] 6 *Del. C.* § 17-1101.
[5] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

I

A

Cantor Fitzgerald, L.P., a global financial services company formed under Delaware law, operates under an Agreement of Limited Partnership (the "Agreement" or "§ _").[6] The plaintiffs in this case—Brad Ainslie, Jason Boyer, Christophe Cornaire, John Kirley, Angelina Kwan, and Rémy Servant—are former Cantor Fitzgerald limited partners.[7] Upon their admission as limited partners, each plaintiff voluntarily signed, and agreed to be bound by, the Agreement.[8] Each plaintiff was also an employee of nonparty Cantor Fitzgerald Hong Kong Capital Markets Limited ("Cantor HK"), a Cantor Fitzgerald affiliate;[9] between 2010 and 2011, each voluntarily resigned from employment with Cantor HK and withdrew as a partner from Cantor Fitzgerald.[10]

B

Cantor Fitzgerald maintains a "Capital Account"[11] for each of its partners that, by default, is to be paid out in annual installments over four years following a partner's withdrawal.[12] A partner's Capital Account contains any High Distribution

---

[6] App. to Opening Br. at A3, A9. Cantor Fitzgerald operates in accordance with the Delaware Revised Uniform Limited Partnership Act ("DRULPA").
[7] Opinion at *2.
[8] *Id.*
[9] *Id.*
[10] *Id.* at *4, *6.
[11] App. to Opening Br. at A12.
[12] *Id.* at A47, A51–53. CFLP has the option to accelerate the payments, but not to delay them.

Units II ("HDII Units") that the partner elects to purchase as well as the partner's profit share.[13] Any distributions and loss share are subtracted from the Capital Account.[14] Each partner's "Adjusted Capital Account" balance, used to determine the amounts payable to certain partners upon termination of their partner status, contains a value equal to the Capital Account without regard to certain regulations and adjustments.[15]

Within ninety days of the date on which a partner ceases to be one, Cantor Fitzgerald will make an initial payment to each former partner consisting of what the Agreement calls a "Base Amount."[16] The remaining difference between the Base Amount and the partner's Adjusted Capital Account is an "Additional Amount" which is paid out annually on the first, second, third, and fourth anniversaries of the Base Amount payment date.[17]

In addition to purchasing HDII Units, Cantor Fitzgerald partners can earn Partnership Units defined as Grant Units and Matching Grant Units.[18] Sections 11.08, 11.09, and 11.10 govern payments to former partners who are Grant Unitholders and Matching Grant Unitholders (the "Grant Amounts").[19] Grant

---

[13] *Id.* at A30–31.
[14] *Id.*
[15] *Id.* at A9–10.
[16] *Id.* at A46.
[17] *Id.* at A47.
[18] *Id.* at A29.
[19] *Id.* at A51–54.

Amounts are not held in a partner's Capital Account; like a former partner's Capital Account balance, however, Grant Amounts are to be paid out in four equal installments over four years following a partner's departure.[20] In this opinion, we refer to the Grant Amounts and the Additional Amounts collectively as the "Conditioned Amounts."

The Agreement contains two inter-related mechanisms designed to discourage former partners from competing with the partnership following their departure from the firm. The Court of Chancery referred to these mechanisms as the "Restrictive Covenants" and the "Conditioned Payment Device." Adopting this nomenclature, we first describe the operation of these mechanisms before focusing on their inter-relationship.

Under § 3.05 of the Agreement, partners agree to a series of "Partner Obligations" for a "Restricted Period" following withdrawal from the partnership.[21] These Partner Obligations require former partners to refrain from, directly or indirectly,[22] (i) breaching the duty of loyalty to Cantor Fitzgerald; (ii) engaging in

---

[20] *Id.*

[21] The "Restricted Period" is defined as either the date one ceases, for any reason, to be a partner, or as a one, two, or four-year period following that date, depending on the activity. *See* App. to Opening Br. at A19–20, 25–26 (§§ 3.05(a)(i) and (v) (through cessation); § 3.05(a)(iii) (one year); § 3.05(ii) (two years); and §§ 3.05 (iv) and (vi) (four years)).

[22] Section 1.01 defines Affiliate "when used with reference to a specified Person, [as] any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified Person." *Id.* at A10.

certain "Competitive Activity" as defined by § 11.04(c);[23] (iii) making or participating in the making of any disparaging comments to the media regarding Cantor Fitzgerald; (iv) taking advantage of, or providing another person with the opportunity to take advantage of a "corporate opportunity"; or (v) taking any action to harm, that harms, or that reasonably could be expected to harm, the partnership.

The obligation mentioned above to refrain from "Competitive Activity" is considered a Partner Obligation and is in force as such for two years following a partner's withdrawal.[24]  According to Section 11.04(c), Competitive Activity occurs when a partner (i) directly or indirectly, or by action in concert with others, solicits, induces, or influences (or attempts to) solicit, induce, or influence, any other partner, employee, or consultant of the partnership or an "Affiliated Entity"[25] to terminate their employment or other business arrangements with the partnership or any Affiliated entity or to engage in any "Competing Business," [26] or hires, employs, or engages (including as a consultant or partner) or otherwise enters into a Competing

---

[23] Section 1.01 states that "Competitive Activities" shall have the meaning given in § 11.04(c). *Id.* at A13.

[24] *Id.* at A19–20, A25.

[25] Affiliated Entities are "the limited and general partnerships, corporations or other entities owned, controlled by or under common control with the Partnership." *Id.* at A10.

[26] An activity is considered a "Competing Business" if it "(i) involves the conduct of the wholesale or institutional brokerage business, (ii) consists of marketing, manipulating or distributing financial price information of a type supplied by the Partnership or any Affiliated Entity to information distribution services or (iii) competes with any other business conducted by the Partnership or any Affiliated Entity if such business was engaged in by the Partnership or an Affiliated Entity or the Partnership or such Affiliated Entity took substantial steps in anticipation of commencing such business prior to the date on which such Partner ceases to be a Partner." *Id.* at A13, A48.

Business with any such person, (ii) solicits any of the customers of the partnership or an Affiliated Entity, induces such customers to reduce their volume of business with, to terminate their relationship with, or otherwise adversely affects their relationship with the partnership or an Affiliated Entity, (iii) does business with any person who was a customer of the partnership or an Affiliated Entity during the twelve-month period prior to a partner's withdraw, (iv) directly or indirectly engages in, represents in any way, or is any way connected with, any Competing Business that directly competes with the business of the partnership or any Affiliated Entity, including as an officer, director, owner, employee, partner, consultant, affiliate or other participant in any Competing Business, or (v) assists others in engaging in any Competing Business with the partnership or an Affiliated Entity.[27]

The determination of whether a limited partner has breached a Partner Obligation is to be made "in good faith by the Managing General Partner in its sole and absolute discretion," and that determination is final and binding.[28] Under § 3.05(b), if a partner breaches his or her Partner Obligations, then, "in addition to any other rights or remedies," Cantor Fitzgerald shall redeem all of the Units held by such partner for a redemption price equal to their Base Amount, and the partner loses the right to any further distributions, including any Additional Amounts, to which

---

[27] *Id.* at A48.
[28] *Id.* at A25–26.

9

the partner would otherwise be entitled.[29]  A partner that breaches her Partner Obligations must also indemnify Cantor Fitzgerald and pay any resulting attorneys' fees and expenses, as well as any and all damages resulting from a breach.[30] Moreover, the Agreement provides that Cantor Fitzgerald may seek injunctive relief to prevent ongoing breaches of Partner Obligations, including engaging in any Competitive Activity, during the Restricted Period.[31]

As mentioned above, the Agreement contains a separate, but overlapping, mechanism designed to discourage competition by former partners.  Under Article XI of the Agreement, the partnership is not obligated to pay the Conditioned Amounts if a former limited partner triggers the Conditioned Payment Device.  The device is triggered by either of two occurrences—a former partner (i) breaching her Partner Obligations (the "No Breach Condition") or (ii) engaging in Competitive Activity (the "Competitive Activity Condition").  The Conditioned Payment Device operates regardless of the reason a partner ceases to be a partner.[32]

---

[29] *Id.* at A25.

[30] *Id.*

[31] *Id.*  Opinion at *4.  There is no dispute that Cantor Fitzgerald did not seek any such relief in the Court of Chancery.  However, Cantor Fitzgerald sued plaintiffs Ainslie and Boyer (and two nonparties to this action) in a Hong Kong court following their respective departures, seeking injunctive relief and the repayment of loan obligations.  *See id.* at *6.  In that litigation, Cantor Fitzgerald alleged that Ainslie and Boyer violated the terms of restrictive covenants in an employment agreement with Cantor HK.  The Hong Kong court denied Cantor Fitzgerald's request for injunctive relief and determined that the noncompete clause contained in the Cantor HK employment agreement was unenforceable under Hong Kong law.  *Id.*

[32] App. to Opening Br. at A48.

If, during the Restricted Period, the Managing General Partner makes a good faith determination that a partner has breached her Partner Obligations, the "No Breach Condition," will not be satisfied, and Cantor Fitzgerald is not obligated to pay the Conditioned Amounts.[33] Section 3.05(b) contemplates that a partner who breaches any Partner Obligation will be subject not only to the restrictive covenants contained in § 3.05 permitting Cantor Fitzgerald to seek injunctive relief, but also to "all of the consequences," including those provided for in Article XI, applicable to a partner that engages in a Competitive Activity.[34]

As previously mentioned, within ninety days of a limited partners' withdrawal, Cantor Fitzgerald is obligated to pay a withdrawing partner the Base Amount from her Capital Account.[35] Following that payment, the Additional Amount is then paid out "[o]n each of the first, second, third and fourth anniversaries of the [Base Amount] Payment Date . . . *provided, that such Partner . . . has not engaged in any Competitive Activity or otherwise breached a Partner Obligation* prior to the date such payment is due."[36]

The same Competitive Activity that may trigger the Restrictive Covenants likewise triggers the Conditioned Payment Device. But whether or not a partner has

---

[33] *Id.* at A47–48.
[34] *Id.* at A25–26.
[35] *Id.* at A46.
[36] *Id.* at A47–48 (emphasis added).

engaged in Competitive Activity after the Restricted Period is not subject to a "final and binding" good faith determination of the Managing General Partner in its "sole and absolute discretion"[37] as is a breach of Partner Obligations during the initial two-year post-separation period.

To remain eligible to receive the Conditioned Amounts, a former limited partner must refrain from Competitive Activity "prior to the date such payment is due."[38] In other words, the financial disincentive for engaging in Competitive Activity is in place for the four years during which the former limited partner is eligible to receive payments from the partnership. So, for example, a partner who refrains from Competitive Activity for two years will receive distributions during that period, but, upon commencement of competition in the third year forfeits distributions thereafter through the fourth year.

Following their withdrawal as limited partners, Cantor Fitzgerald determined that all the former-limited-partner plaintiffs were ineligible to receive the Conditioned Amounts because each had engaged in Competitive Activity within one year of voluntarily withdrawing from the partnership.[39]

Cantor Fitzgerald determined that Kwan, who was employed as managing director and chief operating officer of Cantor HK, after voluntarily resigning from

---

[37] *Id.*
[38] *Id.*
[39] Opinion at *4.

12

her employment and withdrawing as a partner of Cantor Fitzgerald in September 2010, immediately began working at Reorient Group Limited ("Reorient"), a global financial services group providing institutional brokerage services.[40] Following suit in May 2011, Ainslie, Cantor HK's then-managing director and head of Asian equities, and Boyer, Cantor HK's executive managing director, also voluntarily resigned from employment with Cantor HK and withdrew as partners of Cantor Fitzgerald, and went to work for Reorient in October and September 2011, respectively.[41] Ainslie and Boyer's resignation letters, both dated May 30, 2011, stated that they intended to join "an entity which may be viewed as a competitor[.]"[42]

Kwan joined Reorient as executive managing director and chief operating officer.[43] Ainslie joined as executive managing director and head of global markets.[44] And Boyer joined as vice chairman and director.[45] In their respective roles, each plaintiff was involved in recruiting employees and customers for Reorient—including Cantor HK's employees and customers.[46]

Cantor Fitzgerald also determined that in March, September, and November 2011, Cornaire, Servant, and Kirley, each of whom were employed in Cantor HK's

---

[40] Opening Br. at 11; App. to Opening Br. at A931 (citing A201, A205, A249, A345).
[41] App. to Opening Br. at A930–01 (citing A201, A205, A346, A445, A509).
[42] *Id.* (citing A152, A174).
[43] *Id.* (citing A201, A205, A249, A346).
[44] *Id.* (citing A508).
[45] *Id.* (citing A281–82, A303–05).
[46] *Id.* at A933–34 (citing A281–84, A346, A388, A458, A629).

equity derivatives division, resigned from Cantor HK and withdrew as partners of Cantor Fitzgerald.[47] Within a year, each joined ICAP, Cornaire as a managing director for equity products, and Kirley and Servant as equities derivatives brokers.[48] ICAP is a global interdealer brokerage that offers many of the same services as Cantor Fitzgerald affiliates.[49]

Cantor Fitzgerald also determined, as a separate basis for withholding the Conditioned Amounts, that the former partners had each breached at least one Partner Obligation related to their Competitive Activity.[50] Accordingly, Cantor Fitzgerald withheld the Conditioned Amounts, which, as mentioned, ranged from just under $100,000 to over $5 million.[51]

C

Approximately three years following their voluntary resignations from employment with Cantor HK and withdrawal from the Cantor Fitzgerald limited partnership, the plaintiffs filed suit in the Court of Chancery asserting breach-of-contract claims related to the partnership's enforcement of the Agreement and requesting a declaration that "the four-year non-compete provision imposed by [§ 11.04] is not appropriately limited in time or space, fails to protect a legitimate

---

[47] *Id.* at A934–35 (citing Compl. ¶¶ 20, 22, 26, A105, A519).
[48] *Id.* at A935 (citing A304–05).
[49] *Id.* (citing A362, A480–81, A529, A552, A615, A708–09, A715, A790).
[50] *Id.* at A96, A935.
[51] Opinion at *25.

interest of [Cantor Fitzgerald], and is oppressive, and is therefore unenforceable."[52]

Cantor Fitzgerald moved for summary judgment on all counts (in the amended consolidated complaint filed in 2016, there were twelve of them—a breach of contract claim and a request for declaratory relief for each plaintiff).[53]  It argued that, because the plaintiffs had engaged in Competitive Activities and also breached their Partner Obligations, Cantor Fitzgerald was not contractually obligated to pay any Conditioned Amounts to the plaintiffs.[54]  Cantor Fitzgerald did not move for enforcement of the restrictive covenants or request any injunctive relief.  From Cantor Fitzgerald's perspective, as far as the Conditioned Payment Device is concerned the plaintiffs were free to compete but only at the cost of forfeiting their rights to the Conditioned Amounts.

The plaintiffs opposed Cantor Fitzgerald's motion and cross-moved for summary judgment.[55]  The plaintiffs' cross-motion argued that (i) the restrictive covenants and Conditioned Payment Device were restraints of trade that should be evaluated as such for reasonableness,[56] (ii) the Conditioned Payment Device was an unenforceable penalty in the form of a liquidated damages provision enforcing a void restrictive covenant,[57] (iii) Cantor Fitzgerald was precluded as a matter of law

---

[52] *Id.* at *7.
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] App. to Opening Br. at A964–1032.
[57] *Id.* at A1003.

from asserting the anticompetition clauses against Ainslie and Boyer,[58] (iv) there was a genuine dispute of material fact as to whether plaintiffs engaged in Competitive Activity,[59] and (v) Cantor Fitzgerald was not entitled to summary judgment with respect to Ainslie's base amount.[60]

Thus, the parties' summary judgment motions posed competing frameworks for assessing the enforceability of the Conditioned Payment Device. The plaintiffs framed the device as either a penalty that rested on the validity of the underlying Restrictive Covenants, as triggered by the No Breach Condition, or as a restraint of trade voidable under public policy, as triggered by the Competitive Activity Condition.[61] In the plaintiffs' view, enforcement of the Conditioned Payment Device under either condition required a review of the Restrictive Covenants for reasonableness.

Cantor Fitzgerald took issue with those characterizations, insisting instead that the Conditioned Payment Device merely acted as a condition precedent to Cantor Fitzgerald's duty to pay the Conditioned Amounts, not as a *per se* restraint

---

[58] *Id.* at A1007.
[59] *Id.* at A1014.
[60] *Id.* at A1028. Cantor Fitzgerald withheld Ainslie's Base Amount because Ainslie declined to sign a release as requested by Managing General Partner under § 11.12, which purported to release any claims that Ainslie had against Cantor Fitzgerald and would set off amounts he allegedly owed Cantor Fitzgerald under § 2.02(c) of the Agreement. The Court of Chancery granted Cantor Fitzgerald's Motion for Summary Judgment as to Ainslie's entitlement to the Base Amount and that ruling has not been appealed. *Id.* at *27.
[61] *Id.* at *9.

of trade.[62]   Cantor Fitzgerald argued that the Restrictive Covenants were only relevant to determining whether the No Breach Condition was satisfied.   That is, Cantor Fitzgerald argued that it was not seeking to enforce the Restrictive Covenants; rather, it was seeking to ensure the plaintiffs' compliance with the standalone No Breach Condition, as to the Additional Amounts, and the standalone Competitive Activity Condition, as to all Conditioned Amounts, before it paid the Conditioned Amounts.[63]   Cantor Fitzgerald pressed the Court to view both the No Breach Condition and the Competitive Activity Condition of the Conditioned Payment Device as any other bargained-for contractual provision—that is, without evaluating their reasonableness.[64]

## D

The Court of Chancery rejected the plaintiffs' characterization of the Conditioned Payment Device as a damages provision triggered by a breach of the Restrictive Covenants.   The court also rejected the plaintiffs' contention that § 3.05(b) and the No Breach Condition imposed unenforceable penalties.   Instead, the court agreed with Cantor Fitzgerald that the absence of a breach of Partner Obligations and, separately, the absence of competition were conditions precedent to Cantor Fitzgerald's duty to pay the Conditioned Amounts.

---

[62] *Id.*
[63] *Id.*
[64] *Id.*

17

Even so, the Court of Chancery assessed the enforceability of the Restrictive Covenants under the standard test applicable to noncompete agreements[65] and concluded that the covenants were facially overbroad and void as against public policy. The Restrictive Covenants were, according to the court, unenforceable promises and, for this reason, the plaintiffs' failure to comply with them could not be a breach of a Partner Obligation. This meant—or so the court found—that the No Breach Condition had not failed.

The court then turned to the Competitive Activity Condition, a critical component of the Conditioned Payment Device that operates independently from the No Breach Condition. These provisions, as the Court of Chancery observed, are commonly known as "forfeiture for competition" provisions. The plaintiffs urged the Court of Chancery to treat these provisions as restraints of trade that should be evaluated for reasonableness. Cantor Fitzgerald, by contrast, pressed the court to view the forfeiture provisions in the Agreement as financial consequences attending a withdrawing partner's decision to compete and argued in favor of adoption of the "employee choice" doctrine under which courts do not review forfeiture-for-competition provisions for reasonableness so long as the employee

---

[65] Delaware courts review noncompete and nonsolicit agreements subject to Delaware law to ensure that they are (i) reasonable in geographic scope and temporal duration, (ii) advance legitimate economic interests of the party seeking enforcement, and (iii) survive a balancing of the equities. *See FP UC Holdings, LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020).

voluntarily terminated her employment.

The Court of Chancery noted that "other jurisdictions are split" between these positions but that "[o]ther courts have stated that employee choice is the majority approach."[66] Giving great weight to two trial court opinions that viewed liquidated damages provisions enforcing noncompete and nonsolicit agreements with skepticism, the Court of Chancery chose not to apply the employee-choice doctrine and subjected the Competitive Activity Condition and the forfeiture resulting from its failure to a reasonableness review.

The court did not select the restraint-of-trade framework to the exclusion of the employee-choice doctrine without first considering the contending policy interests. It concluded that:

> Delaware's emphasis on balancing an employer's ability to contractually protect its good will, confidential information, customers, and other assets against the public policy favoring free competition and employee mobility, and Delaware's distaste for liquidated damages provisions that restrain trade by requiring employees to pay former employers if they compete—even unknowingly and in an amount untethered to the employer's loss—supports joining the ranks of jurisdictions that review forfeiture-for-competition provisions for reasonableness as restraints on trade.[67]

Then, analyzing the Competitive Activity Conditions under the reasonableness standards that it earlier applied to the No Breach Condition, the Court of Chancery

---

[66] Opinion at *21.
[67] *Id.* at *25.

19

determined that, although the provision was "more reasonable," it was unenforceable due in large part to its four-year duration, and thus was invalid as an unreasonable restraint of trade.[68]

Because the court determined that both the No Breach and Competitive Activity Conditions were unenforceable, it concluded that the Conditioned Payment Device as a whole was "an unreasonable restraint built on unreasonable restrictive covenants," was unenforceable, and could not excuse Cantor Fitzgerald from its obligation to pay the Conditioned Amounts.[69] Because of this ruling, the court found it unnecessary to reach the plaintiffs' argument that there was a genuine issue of material fact as to whether they actually engaged in Competitive Activity. Consequently, as to the claims before us now, the Court of Chancery entered summary judgment in favor of the plaintiffs, and Cantor Fitzgerald appealed.

E

Cantor Fitzgerald presses three arguments germane to our resolution of this appeal. First, Cantor Fitzgerald depicts the Court of Chancery's analysis as unfaithful to our strong contractarian tradition as reflected in the Delaware Revised Uniform Partnership Act and our case law. Second—and not entirely unrelated to

---

[68] *Id.* at *26. Recognizing that former partners were still free to compete with the partnership, the Court of Chancery said that it would "scal[e] the review back to the more lenient or employer-friendly review Delaware affords restrictive covenants in the sale of a business as compared to an employment agreement." *Id.* at *25. The court did not, however, describe the manner in which it limited its review.

[69] *Id.* at *28.

20

the first—it contends that the Conditioned Payment Device should not be subject to judicial review for reasonableness but, instead, should be enforced according to the terms to which the parties agreed. Third and finally, Cantor Fitzgerald argues that the Court of Chancery misconstrued the parties' relationship, focusing on the plaintiffs as employees of Cantor HK and not, as it should have, as partners in Cantor Fitzgerald.[70]

The plaintiffs counter that the Court of Chancery correctly (i) weighed the competing policy interests in enforcing private agreements and disfavoring restraints of trade, (ii) determined that the Conditioned Payment Device was predicated on an unenforceable promise, and (iii) focused on the plaintiffs' status as Cantor HK employees over their status as Cantor Fitzgerald partners.

## II

## A

There is no dispute that, if the Conditioned Payment Device is enforced according to its terms, Cantor Fitzgerald is not required to pay the Conditioned Amounts to the plaintiffs. On the other hand, Cantor Fitzgerald must pay those amounts if we determine—as the Court of Chancery did—first, that a public policy

---

[70] Cantor Fitzgerald challenges the Court of Chancery's refusal to "blue pencil" the Agreement to a level of reasonable restrictiveness given the plaintiffs' "near-immediate competition." Because we hold that the partnership was justified in withholding the Conditioned Payments, we need not address that issue.

21

of this State overrides the parties' unambiguous agreement that the Conditioned Amounts are not payable unless the Competitive Activity Condition has been met and, second, that the scope of the Competitive Activity Condition is unreasonable. We review such questions—that is, questions that hinge on public policy grounds—*de novo*.[71]

## B

We agree with, and the plaintiffs have not challenged on appeal, the Court of Chancery's conclusion that the Conditioned Payment Device comprises two conditions—the No Breach Condition and the Competitive Activity Condition—to Cantor Fitzgerald's duty to pay the Conditioned Amounts. We also agree that these conditions are "disjunctive"[72] such that the failure of either relieves Cantor Fitzgerald of its duty to pay those amounts. As to the No Breach Condition, the Court of Chancery held that, because the Restrictive Covenants were unenforceable, the plaintiffs could not have breached them so as to trigger the No Breach Condition. This left Cantor Fitzgerald with the Competitive Activity Condition as a basis for eliminating its duty to pay the Conditioned Amounts. We attend first, therefore, to the enforceability of the Conditioned Payment Device to the extent that it was triggered by the Competitive Activity Condition.

---

[71] *RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 902 (Del. 2021).
[72] Opinion at *14.

22

C

In determining whether to review the Conditioned Payment Device for reasonableness when the device is triggered by the failure of the Competitive Activity Condition, the Court of Chancery relied heavily on Delaware law's "treatment of liquidated damages provisions enforcing noncompete and nonsolicit agreements, as distinct from injunctive relief."[73] At the heart of the court's decision was its conclusion that "Delaware's distaste for liquidated damages provisions that restrain trade by requiring employees to pay former employers if they compete—even unknowingly and in an amount untethered to the employer's loss—supports joining the ranks of jurisdictions that review forfeiture-for-competition provisions for reasonableness as restraints on trade."[74] The court's reliance on this liquidated damages analogy was, in our view, misplaced.

It bears noting here that, earlier in its opinion, the court had rejected the plaintiffs' argument that the Conditioned Payment Device was an unenforceable damages provision. It found, instead, that the Competitive Activity Condition was a condition precedent to Cantor Fitzgerald's duty to pay the Conditioned Amounts. We agree with that conclusion, and the plaintiffs do not contest it on appeal.[75] This distinction is significant; liquidated damages, by definition, are a remedy for breach

---

[73] *Id.* at *22.
[74] *Id.* at *25.
[75] *See id.* at *13–14.

of contract and are not recoverable for a failure to meet a condition precedent.[76]

Despite concluding that the Competitive Activity Condition was a condition precedent, the court rested its policy analysis on case law reviewing liquidated damages provisions "enforcing noncompete and nonsolicit agreements,"[77] as contained in employment agreements whose underlying covenants were subject to a review for reasonableness. This comparison is, in our view, inapt. It does not follow that, because courts review restrictive non-competition covenants and liquidated damages provisions enforcing them in a particular manner—subjecting them to review for reasonableness—we should review forfeiture-for-competition provisions in the same way.

Moreover, the two liquidated damages cases on which the Court of Chancery grounded its policy discussion—*Faw, Casson & Co., L.L.P. v. Halpen*,[78] and *Lyons Insurance Agency, Inc. v. Wark*,[79]— are distinguishable from this case. Both *Wark* and *Halpen* dealt with lawsuits initiated by former employers seeking to enforce liquidated damages provisions contained in employment agreements against former

---

[76] *See Brazen v. Bell Atlantic Corp.*, 695 A.2d 43, 67 (Del. 1997) ("[l]iquidated damages, by definition, are damages paid in the event of a breach.") (citing Restatement (Second) of Contracts § 356 (1981)); *Supernus Pharms., Inc. v. Reich Consulting Grp., Inc.*, 2021 WL 5046713, at *6 (Del. Ch. Oct. 29, 2021) ("nonperformance of a condition precedent is not a breach of contract since the purpose of the condition is merely to qualify the duty to perform immediately.").

[77] Opinion at *22.

[78] 2001 WL 985104 (Del. Super. Ct. Aug. 7, 2001).

[79] 2020 WL 429114 (Del. Ch. Jan. 28, 2020).

employees—an insurance agent and accountant, respectively.[80] In both cases, the court considered whether the damages the employer demanded for breach of the restrictive covenant were reasonable in light of the employees' actions and concluded that damages provisions untethered to an employer's reasonable interests in preventing competition, and unrelated to any action taken by a former employee, were unreasonable restraints of trade.[81]

Here the claims under review were not brought by an employer seeking to enforce a liquidated damages provision for an employee's breach of a restrictive covenant in an employment agreement; rather, this is a lawsuit initiated by former limited partners against the partnership requesting that a forfeiture-for-competition provision be declared invalid under the same test as applied to traditional noncompete agreements. Unlike in *Halpen* and *Wark*, the provision at issue here is not a penalty enforced against an employee based on the breach of a restrictive covenant; it is a condition precedent that excuses Cantor Fitzgerald from its duty to pay if the plaintiffs fail to satisfy the condition to which they agreed to be bound in order to receive a deferred financial benefit.

That cases concerning liquidated damages as a remedy for breach of restrictive covenants do not provide reliable guidance here finds support in decisions

---

[80] *See Wark*, 2020 WL 429114, at *2; *Halpen*, 2001 WL 985104, at *1.
[81] *See Wark*, 2020 WL 429114, at *7; *Halpen*, 2001 WL 985104, at *1 & n.1.

of the United States District Court for the District of Delaware and the Superior Court. For example, in *W.R. Berkley Corporation v. Dunai*,[82] the district court determined that a provision requiring a corporate vice president to return $200,000 in stock benefits if she engaged in competitive activity within one year of leaving the company was not, as Dunai asserted, a noncompete. Relying in part on *W.R. Berkeley Corporation v. Hall*,[83] the court reasoned that this was so because the considerations underlying a traditional noncompete, such as a restriction on freedom of employment, were absent from a provision calling only for a forfeiture of benefits.[84] The court also rejected Dunai's argument that the clawback provision was an unenforceable liquidated damages provision. In the court's words, the clawback was not "a $200,000 penalty for working for a competitor; it [wa]s returning a supplemental benefit for breaching the terms of a bargain. That is not a liquidated-damages provision."[85]

*Hall* reached a similar conclusion. There, a senior vice president quit his employment to pursue an opportunity with a competitor.[86] Within six months, he exercised stock options and realized a gain of approximately $180,000.[87] The stock

---

[82] 2021 WL 1751347 (D. Del. May 4, 2021).
[83] 2005 WL 406348 (Del. Super. Ct. Feb. 16, 2005).
[84] *Id.* at *2. Reviewing the clawback provision as a term in a contract, not as a noncompete, the court determined the that it was reasonable.
[85] *Id.*
[86] *Hall*, 2005 WL 406348, at *1.
[87] *Id.*

incentive plan permitted the company to "recapture the profits" if Hall competed with the company within six months of exercising his option.[88] Hall attempted to frame the recapture provision as a liquidated damages provision, but the court determined that, no matter the "spin" put on the provision, Hall's "freedom of employment was not abridged and the provision was "simply a contractual obligation that require[d] a senior management employee to remain with the company for six months . . . to retain the full benefit of the stock option."[89] Hall "knew of this obligation and simply now [was] asking the [c]ourt to free him of this responsibility."[90] The court declined to do so.[91]

In short, we are not satisfied that our liquidated damages jurisprudence provides a policy-based counterweight sufficient to override our strong interest in enforcing contracts as written. We turn then to the policy considerations that weigh in favor of enforcing the Conditioned Payment Device.

D

In ascertaining the public policy of this State as it relates to the enforceability of the provisions of limited partnership agreements, we need not look far. The Delaware General Assembly explicitly declared that it is the policy of the Delaware

---

[88] *Id.*
[89] *Id.* at *3, *5.
[90] *Id.* at *5.
[91] *Id.*

27

Revised Uniform Limited Partnership Act ("DRULPA") "to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."[92] We have recognized that:

> [DRULPA's] basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provisions in their partnership agreement. Truly, the partnership agreement is the cornerstone of Delaware limited partnership, and effectively constitutes the entire agreement among the partners with respect to the admission of partners to, and the creation, operation and termination of, the limited partnership. Once partners exercise their contractual freedom in their partnership agreement, the partners have a great deal of certainty that their partnership agreement will be enforced in accordance with its terms.[93]

The emphatic policy statement in DRULPA corresponds with our courts' tradition of "ensur[ing] freedom of contract . . . in order to facilitate commerce."[94] We "uphold[] the freedom of contract and enforce[] as a matter of *fundamental public policy* the voluntary agreements of sophisticated parties."[95] As former Chief Justice Strine, while serving as Vice Chancellor, wrote in a passage we have since cited with approval:

---

[92] 6 *Del. C.* § 17-1101(c); *see also Boardwalk Pipeline Partners, LP v. Bandera Master Fund LP*, 288 A.3d 1083, 1108 (Del. 2002) (noting "the primacy of partnership agreements" and that "Delaware courts respect the terms of a partnership's governing agreements to preserve the 'maximum flexibility' of contract."); *see also Ketler v. PFPA, LLC*, 132 A.3d 746, 748 (Del. 2016) ("The public policy of this [S]tate is typically determined by the Delaware General Assembly.").

[93] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999) (quoting Martin I. Lubaroff & Paul Altman, *Delaware Limited Partnerships* § 1.2 (1999)).

[94] *eV3, Inc.*, 103 A.3d at 181 n.3.

[95] *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 n.14 (Del. 2015) (emphasis added).

28

When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract.

Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations.[96]

Of course, as this quotation notes, freedom of contract is not absolute. For instance, "contracts that offend public policy or harm the public are deemed *void*, as opposed to voidable."[97] But, given our "strong interest in freedom of contract[,]" covenants not to compete subject to Delaware law do not fall into this category.[98]

Here, the Court of Chancery recognized that the Competitive Activity Condition, which does not "limit[] a partner's ability to compete or otherwise obtain employment,"[99] stands on different footing than underlies non-competition covenants such as the Restrictive Covenants underpinning the No Breach Condition. The Agreement, and in particular Section 11.02(c), states unambiguously:

Each partner acknowledges that this Article XI is intended solely to reflect the economic agreement between the Partners with respect to amounts payable upon a Partner's Bankruptcy or Termination. *Nothing in this Article XI shall be considered or interpreted as restricting the ability of a former Partner in any way from engaging in any Competitive Activity, or in other employment of any nature whatsoever*,

---

[96] *RSUI Indem. Co.*, 248 A.3d at 903 (quoting *Libeau*, 880 A.2d at 1056–57).
[97] *Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011).
[98] *NuVasive, Inc. v. Miles*, 2018 WL 4677607 (Del. Ch. Sept. 28, 2018).
[99] Opinion at *14.

29

subject in either case to the restrictions elsewhere in this Agreement (including without limitation in Sections 3.05 and 8.06).[100]

Thus, the Competitive Activity Condition does not restrict competition or a former partner's ability to work; nor does competition support injunctive relief. But if the former partner wishes to compete with Cantor Fitzgerald during the relevant time, Cantor Fitzgerald need not confer the deferred benefit on the former partner, who has agreed to forfeit that benefit upon engaging in competition.

E

With these principles in mind, we turn to the parties' competing perspectives on the policy implications surrounding enforcement of the Conditioned Payment Device. The plaintiffs, on the one hand, argue that the forfeiture-for-competition provision implicates the public policy disfavoring restraints of trade and thus urge the Court to adopt the same reasonableness analysis that is applied to traditional noncompetes. On the other hand, Cantor Fitzgerald argues that we should be guided by the employee-choice doctrine, which "assumes that an employee who elects to leave a company makes an informed choice between forfeiting a certain benefit or retaining the benefit by avoiding competitive employment."[101]

Jurisdictions adopting the plaintiffs' view conclude that the threat of economic loss from a forfeiture provision operates as a restraint of trade.

---

[100] App. to Opening Br. at A46 (emphasis added).
[101] *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

Additionally, because the purpose of a forfeiture provision—to deter competitive employment—is identical to a typical restrictive covenant, those courts find it appropriate to evaluate forfeiture provisions for reasonableness using the same lens through which they would view a traditional noncompete agreement.[102]

Jurisdictions adopting the employee-choice doctrine reason that the forfeiture, unlike the restraint prohibiting competition included in an employment contract, does not prohibit the employee from engaging in competitive work but merely denies her the right to some financial benefit if she chooses to engage in competitive activity,[103] and thus they are not restraints of trade.[104]

---

[102] *See Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723 (Ariz. 2006); *Deming v. Nationwide Mut. Ins. Co.*, 905 A.2d 623, 634 (Conn. 2006) (analyzing a forfeiture-for-competition clause under the reasonableness test applied to covenants not to compete but recognizing that this was not the majority approach); *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 97 Cal. Rptr. 811 (Ct. App. 1971) (citing *Muggill v. Reuben H. Donnelley Corp.*, 398 P.2d 147 (Cal. 1965)); *Flammer v. Patton*, 245 So. 2d 854 (Fla. 1971); *A.L. Williams & Assocs. v. Faircloth*, 386 S.E.2d 151 (Ga. 1989); *Prudential Locations, LLC v. Gagnon*, 509 P.3d 1099 (Haw. 2022); *Torrence v. Hewitt Assocs.*, 493 N.E.2d 74 (Ill. App. Ct. 1986); *Woodward v. Cadillac Overall Supply Co.*, 240 N.W.2d 710 (Mich. 1976); *Harris v. Bolin*, 247 N.W.2d 600, 602 (Minn. 1976); *Mungas v. Great Falls Clinic, LLP*, 221 P.3d 1230, 1238 (Mont. 2009); *Brockley v. Lozier Corp.*, 488 N.W.2d 556 (Neb. 1992); *Gaver v. Schneider's O.K. Tire Co.*, 856 N.W.2d 121 (Neb. 2014); *Ellis v. Lionikis*, 394 A.2d 116 (N.J. Super. Ct. App. Div. 1978) (citing *Knollmeyer v. Rudco Indus., Inc.*, 381 A.2d 378 (N.J. Super. Ct. App. Div. 1977)); *Werlinger v. Mut. Serv. Cas. Ins. Co.*, 496 N.W.2d 26, 29–30 (N.D. 1993); *Graham v. Hudgins, Thompson, Ball & Assocs., Inc.*, 540 P.2d 1161 (Okla. 1975); *Lavey v. Edwards*, 505 P.2d 342 (Or. 1973); *Almers v. S.C. Nat. Bank of Charleston*, 217 S.E.2d 135 (S.C. 1975); *Rosploch v. Alumatic Corp. of Am.*, 251 N.W.2d 838, 840 (Wis. 1977). In *Pollard v. Autotote, Ltd.*, 852 F.2d 67 (3d Cir. 1988), the United States Court of Appeals for the Third Circuit surmised that we would follow this approach. By our decision today, we respectfully confute that prediction.

[103] *See, e.g., Grebing v. First Nat. Bank of Cape Girardeau*, 613 S.W.2d 872, 875–76 (Mo. Ct. App. 1981).

[104] As best we can discern, other jurisdictions that have taken up this issue are split. *See e.g.*, *Lucente*, 310 F.3d at 254; *S. Farm Bureau Life Ins. Co. v. Mitchell*, 435 So. 2d 745, 747 (Ala. Civ. App. 1983); *Collister v. Bd. of Trustees of McGee Co. Profit Sharing Plan*, 531 P.2d 989, 990

31

F

The distinction between a restrictive non-competition covenant that precludes

a former employee from earning a living in his chosen field and an agreement that

(Colo. App. 1975); *Trumble v. Farm Bureau Mut. Ins. Co. of Idaho*, 456 P.3d 201, 212 (Idaho 2019); *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 790 P.2d 404, 413 (Kan. 1990); *Kops v. Lee*, 871 So. 2d 1187 (La. Ct. App. 2004); *Alco-Columbia Paper Serv., Inc. v. Nash*, 273 So. 2d 630, 634 (La. Ct. App. 1973) ("The forfeiture provision was one of the conditions to which the defendant agreed when he entered the plan. We are convinced that he is bound by it."); *Allegis Grp., Inc. v. Jordan*, 951 F.3d 203, 210–11 (4th Cir. 2020) (applying Maryland law) ("the defendants have pointed to no case in which a *condition precedent* has been reviewed for reasonableness, even in the employment context . . . [p]articipants in the Incentive Plan were well compensated, high-level professionals who were given *the option* to join the program during their employment and, following separation, had the *further choice* of whether to receive payments or to compete with Allegis and its subsidiaries.") (emphasis in original); *Cheney v. Automatic Sprinkler Corp. of Am.*, 385 N.E.2d 961, 964 (Mass. 1979) ("[T]he majority view in this country seems to be that a forfeiture for competition clause in an employment agreement is enforceable without regard to . . . reasonableness[.]"); *Alldredge v. City Nat'l Bank & Tr. Co. of Kansas City*, 468 S.W.2d 1 (Mo. 1971); *Grebing*, 613 S.W.2d 872; *Swift v. Shop Rite Food Stores, Inc.*, 489 P.2d 881, 883 (N.M. 1971); *Kristt v. Whelan*, 164 N.Y.S.2d 239 (N.Y. App. Div. 1957); *Rochester Corp. v. Rochester*, 450 F.2d 118 (4th Cir. 1971) (applying Virginia law); *Fraser v. Nationwide Mut. Ins. Co.*, 334 F. Supp. 2d 755, 760–61 (E.D. Pa. 2004) (noting that the defendant "could either abide by the conditions required to receive the deferred compensation or not, it was his choice" and that it was "probable that [the defendant] recognized the loss . . . as the opportunity cost of accepting other employment, and chose to compete because it was more economically advantageous to do so); *Garner v. Girard Tr. Bank*, 275 A.2d 359 (Pa. 1971); *Ekman v. United Film Serv., Inc.*, 335 P.2d 813, 814 (Wash. 1959) ("We know of no legal prohibition which prevents competent parties from contracting as to the terms and conditions under which unaccrued, prospective, and contingent commissions shall be paid. The elements which nullify a contract as being in restraint of trade are not present here."). *See also Cont'l Carbonic Prod., Inc. v. Cohen*, 241 S.W.3d 296 (Ark. 2006); *Montgomery v. Lowe*, 507 F. Supp. 618, 620 (S.D. Tex. 1981) ("[A] distinction may be drawn where the consequence of violating a non-competitive clause is a clearly defined and understood forfeiture of accrued benefits contributed by the protected party. . . . The burden in such a case is contemplated by both parties and does not in any way interfere with [the defendant's] livelihood.") (internal citations omitted); *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 329 (Tex. 2014) (noting that, "under Texas law," a forfeiture clause in non-contributory profit-sharing plan was not a covenant not to compete—but reserving the decision as to whether such provisions are unreasonable restraints of trade under Texas law, such that they are unenforceable, for another day); *Rieves v. Buc-ee's Ltd.*, 532 S.W.3d 845, 853 (Tex. App. 2017); *Connell v. Wells Fargo & Co.*, 2016 WL 4733448 (S.D. Tex. Sept. 12, 2016), *subsequently aff'd*, 699 F. App'x 446 (5th Cir. 2017).

allows a former partner to compete but at the cost of relinquishing a contingent benefit is, in our observation, significant. In the restrictive-covenant context, the former employee is effectively deprived of his livelihood and, correspondingly, exposed to the risk of serious financial hardship. This gives rise to the strong policy interest that justifies the review of unambiguous contract provisions for reasonableness and a balancing of the equities, two exercises typically foreign to judicial review in contract actions. By contrast, however, forfeiture-for-competition provisions, which, unlike restrictive covenants, are not enforceable through injunctive relief, do not prohibit employees from competing and remaining in their chosen profession, and do not deprive the public of the employee's services, present no such concern. The policy interest that preponderates in the former case is diminished—if it does not vanish—in the latter. To put it another way, the interest to be vindicated when evaluating a covenant that prohibits competition and that might even preclude gainful employment is significantly weakened when competition—often (as in this case) highly remunerative—is permitted. That diminished interest is insufficient to override DRULPA's directive to "give maximum effect to the principle of freedom of contract and the enforceability of partnership agreements."

G

Finally, we address the Court of Chancery's observation that forfeitures are disfavored and do not enjoy our courts' contractarian deference.[105] This is so, the court reasoned, because, like liquidated damages provisions, forfeiture provisions might conflict with public policy or result in inequitable outcomes.[106]

We disagree that the common law's disfavor of forfeitures extends to limited partnership agreements. As the Court of Chancery recognized, 6 *Del. C.* § 17-306 permits partnership agreements to contain consequences that would be "unavailable in a standard commercial contract, most notably penalties and forfeitures."[107]

This express divergence from the common law on forfeitures, considered in light of DRULPA's statutory mandate to honor freedom of contract in partnership agreements, leads us to conclude that forfeitures in limited partnership agreements should enjoy this court's deference on equal footing with any other bargained-for-term in a limited partnership agreement.[108] Although it is conceivable that a public-policy interest or inequitable outcome could, under some circumstances,

---

[105] Opinion at *24.
[106] *Id.*
[107] *Id.* at *12 (noting that "[i]n the partnership setting, the common law disfavor of penalties yields to statute" and explaining that "that 6 *Del. C.* § 18-306 which mirrors Section 17-306, departs from the common law in that it 'authorizes LLC agreements to provide for remedies that would be unavailable in a standard commercial contract, most notably penalties and forfeitures.'").
[108] *See In re Cellular Telephone P'ship Litig.*, 2021 WL 4438046, at *73 (Del. Ch. Sept. 28, 2021) (discussing that DRUPA, 6 *Del. C.* § 15-408, which mirrors 6 *Del. C.* § 17-306 "authorizes" forfeitures in partnership agreements).

34

outweigh the interest in freedom of contract enshrined in DRULPA, such circumstances are not present here.[109] In this case, the plaintiffs voluntarily entered into the partnership and the Agreement, elected to compete with the partnership upon their departure, and thereby assumed the risk of the forfeiture.[110]

## III

To sum up, we disagree with the Court of Chancery's conclusion that forfeiture-for-competition provisions like the one at issue here are restraints of trade subject to review for reasonableness. When sophisticated parties agree in a limited partnership agreement that a partner, who voluntarily withdraws from, and then competes with, the partnership, will forfeit contingent post-withdrawal financial benefits, public-policy considerations weigh in favor of enforcing that agreement. It follows that the court erred in ruling that Cantor Fitzgerald could not rely on the Competitive Activity Condition and the Conditioned Payment Device to withhold the Conditioned Payments from the plaintiffs. We therefore reverse the Court of Chancery's final judgment and remand for further proceedings consistent with this

---

[109] *See* Restatement (Second) of Contracts § 227(1) explaining that the court's preference for contractual interpretations that reduce the risk of forfeiture resulting from a condition need not be present where "the event is within the obligee's control, or the circumstances indicate that he has assumed the risk."

[110] Cantor Fitzgerald's internal documents suggest that it relies on the Conditioned Payment Device to excuse its obligation to make payments to an estimated 40% of former partners." *See* Answering Br. at 12 citing App. to Answering Br. at B32. *See also id.* at A538 (at his deposition, Servant testified that "everyone knows if you go to competition [. . .] [t]hen you may have to forfeiture part of the your -- all your shares.").

opinion, including a determination whether there is a genuine issue of material fact as to whether the plaintiffs engaged in Competitive Activity.