# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MERA USA, LLC                                :
                                             :
      Plaintiff,                  :
                                             :
      v.                          :    C.A. No. 2024-0188-MTZ
                                             :
MCS BURBANK, LLC                             :
                                             :
      Defendant.                  :

---

MCS BURBANK, LLC, a limited liability    :
company, for itself and derivatively on   :
behalf of MERA RD LLC, a Delaware        :
limited liability company,               :
                                         :
      Defendant/Counterclaim          :
      Plaintiff/Third-Party Plaintiff, :
                                         :
      v.                              :
                                         :
MERA USA LLC, a Delaware limited         :
liability company,                       :
                                         :
      Plaintiff/Counterclaim          :
      Defendant,                      :
                                         :
    and                             :
                                         :
MERA RD2, LLC, MERA RD3, LLC,            :
MERA RD4, RAPHAEL AQUIRRE and            :
ALEX MOLET WARSCHWASKI,                  :
                                         :
      Third-Party Defendants,         :
                                         :
    and                             :
                                         :
MERA RD LLC,                             :
                                         :
      Nominal Third-Party             :
      Defendant.                      :

## ORDER GRANTING IN PART MERA USA, LLC'S
## MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

WHEREAS, having considered the Motion for Partial Judgment on the Pleadings (the "Motion")[1] filed by plaintiff MERA USA, LLC ("MERA"), related briefing, and oral argument, it appears that:[2]

A.    Nominal defendant MERA RD LLC (the "JV"), a Delaware LLC, operates in the airport concession industry.[3] Specifically, it operates in the context of the Federal Aviation Administration's ("FAA") Airport Concession Disadvantaged Business Enterprise ("ACDBE") program, regulated via 49 C.F.R. Parts 23 and 26.[4]

B.    The JV has three members: MERA, defendant MCS Burbank, LLC ("MCS"), and nonparty La Farm Bakery Bistro RD, LLC ("La Farm").[5] MCS is an ACDBE.[6] The JV is governed by an LLC agreement (the "JV Agreement"),[7] as

---

[1] Docket Item [hereinafter "D.I."] 68.

[2] Citations in the form "AC ¶" refer to Plaintiff's Amended Verified Complaint for Injunctive Relief, available at D.I. 26. Citations in the form "Ans. ¶" refer to Defendant MCS Burbank, LLC's Answer to Plaintiff's Amended Verified Complaint for Injunctive Relief, available at D.I. 37. Citations in the form "POB" refer to Plaintiff's Opening Brief in Support of MERA's Motion for Partial Judgment on the Pleadings, available at D.I. 68. Citations in the form "DAB" refer to Defendant MCS Burbank, LLC's Answering Brief in Opposition to MERA's Motion for Partial Judgment on the Pleadings, available at D.I. 112. Citations in the form "PRB" refer to Plaintiff's Reply Brief in Further Support of its Motion for Partial Judgment on the Pleadings, available at D.I. 116.

[3] AC ¶¶ 1–2; POB at Ex. 1 [hereinafter "JV Agr."] § 2.2.

[4] POB at Ex. 3 [hereinafter "Lease Agr."] §§ 21, 21.3, 21.5; *see* JV Agr. § 4.7; AC ¶ 100.

[5] JV Agr. at Ex. A; POB at Ex. 2 [hereinafter "Letter Agr."] ¶ 2 (amending Exhibit A to the JV Agreement); Ans. ¶ 4.

[6] JV Agr. § 4.7.

[7] *Id.* at Recital.

amended by a letter agreement (the "Letter Agreement"), both dated December 19, 2019.[8] The JV Agreement is governed by Delaware law.[9] The JV was formed to bid for a concession opportunity at Raleigh-Durham International Airport.[10] The JV was awarded the bid and entered into a Terminal Concession Lease Agreement (the "Lease Agreement") with the Raleigh-Durham International Airport Authority ("RDUA"), on February 1, 2020.[11] Under 49 CFR Part 26, an ACDBE partner like MCS can only be replaced with RDUA's written consent.[12] RDUA's consent in turn requires "good cause."[13] The Lease Agreement and JV Agreement include provisions to ensure compliance with the ACDBE program.[14]

C. This action concerns MERA's attempt to remove MCS's designee from all roles and repurchase MCS's JV membership interest, with the aim of swapping in a different ACDBE. On January 25, 2024, MERA as majority member,[15] and MERA's designated managers constituting a majority of the JV's managers, executed a written

---

[8] Letter Agr. at Recital.

[9] JV Agr. § 13.1.

[10] *Id*. § 2.2.

[11] *See generally* Lease Agr.

[12] 49 C.F.R. §§ 26.53(f)(1)(i) ("[RDUA] must require that a prime contractor not terminate a DBE . . . without your prior written consent . . . ."). A "DBE" is a "Disadvantaged Business Enterprise." *Id*. § 26.5.

[13] *Id*. §§ 26.53(f)(2) ("[RDUA] may provide such written consent only if [RDUA] agree[s] . . . that the prime contractor has good cause to terminate the listed DBE or any portion of its work."). *Id*. §§ 26.53(f)(3)(i)–(x) (providing illustrative examples of what constitutes "good cause" in this context).

[14] Lease Agr. §§ 21.2, 21.3, 21.5; JV Agr. § 4.7.

[15] JV Agr. § 1.25.

consent (the "January 25 Written Consent").[16] Pursuant to the January 25 Written Consent, a majority of managers purported to cause the JV to remove MCS's designee as Operational Director;[17] and to remove MCS's designee as Vice President.[18] Under the January 25 Written Consent a majority of members also purported to remove MCS's designee as manager.[19] Via the January 25 Written Consent, the JV determined the Interest Purchase Price of MCS's membership interest by retaining a valuation firm and authorized the JV to exercise its right to repurchase MCS's membership interest, with the approval of a majority of members and managers.[20] The next day, again acting by written consent, a majority of members and managers resolved to seek RDUA's approval to remove MCS and its designee from the JV (the "January 26 Written Consent" and with the January 25 Written Consent, the "Written Consents").[21] On January 28, MCS's designee received notice that her removal as manager was effective immediately.[22]

D.    On January 29, MERA notified RDUA of the JV's intent to request RDUA's approval to remove and replace MCS as the JV's ACDBE.[23] On February 8,

---

[16] POB at Ex. 6 [hereinafter "Jan. 25 Written Consent"].

[17] Jan. 25 Written Consent § I.

[18] *Id.* § II.

[19] *Id.* § III.

[20] *Id.* § IV.

[21] POB at Ex. 7 [hereinafter "Jan. 26 Written Consent"].

[22] *Id.* at Ex. 8; JV Agr. § 12.1 ("Notice of removal shall be served on the Manager and shall set forth the date on which the removal becomes effective.").

[23] POB at Ex. 9.

MERA, as the JV's majority member, caused the JV to submit its official request setting forth the JV's grounds for seeking to remove MCS.[24] RDUA approved that request on April 2: it "determined that MERA has provided documentation sufficient to demonstrate 'good cause'" and that the removal request complied with 49 CFR Parts 23 and 26.[25]

E.     On February 29, MERA initiated this action and sought expedition and temporary injunctive relief.[26] On April 19, MERA filed its Verified Amended Complaint for Injunctive Relief (the "Amended Complaint").[27] Count II under 6 *Del. C.* §§ 110 and 111 seeks a declaration the JV validly removed MCS and its designee from the JV and repurchased MCS's membership interest.[28] MCS answered the Amended Complaint (the "Answer").[29] The Court denied MERA's TRO but entered a June 17 status quo order preserving the positions MCS and its designated Manager, Vice President, and Operational Director held before the Written Consents.[30]

F.     This dispute spilled into several other jurisdictions, including the FAA.[31]

---

[24] *Id*. at Ex. 10.

[25] *Id*. at Ex. 4.

[26] D.I. 1; D.I. 2; D.I. 3.

[27] D.I. 26; D.I. 27; D.I. 28.

[28] AC ¶¶ 95–109.

[29] *See generally* Ans.

[30] D.I. 49; D.I. 54.

[31] MCS initiated two administrative proceedings before the FAA challenging the RDUA's determination that "good cause" existed for MERA to replace MCS, including under 49 C.F.R. § 23.53(f). D.I. 76 at Exs. A–B. MCS also sued in the Eastern District of North Carolina where it sought a temporary restraining order ("TRO") on the basis RDUA violated that same section. POB Ex. 5 at 2.

5

This action was stayed on the representation that RDUA's approval of MCS's removal was being appealed or collaterally attacked before the FAA.[32] On August 30, 2025, MERA filed the Motion seeking judgment on the pleadings on Count II.[33] The stay was lifted on October 9, 2025.[34] The Motion was briefed and the Court heard argument on May 29, 2026.[35]

G. The standard of review for a motion for judgment on the pleadings is familiar:

> In determining a motion under Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party. The court must take the well-pleaded facts alleged in the complaint as admitted. A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law.[36]

> [J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact . . . . If the contract's meaning is unambiguous, [and that meaning supports the movant's claim or defense], the court must

---

[32] D.I. 88.

The Eastern District of North Carolina denied MCS's TRO because "it does not appear that a district court has any role to play in adjudicating alleged violations of 49 C.F.R. § 26.53(f)" and directed MCS to seek relief by filing a complaint with the FAA and appeal the outcome if necessary. POB Ex. 5 at 2. On May 28, 2026, MCS provided this Court and the parties a letter from the FAA stating the FAA would defer jurisdiction to this Court, and that MCS could refile with the FAA after termination of this proceeding if it did not result in a merits decision or settlement. D.I. 123 at Ex. A. The FAA's May letter clarified that MCS had not filed a complaint under 14 CFR Part 13. *Id.*

[33] D.I. 68.

[34] D.I. 99; *see* D.I. 96; D.I. 95; D.I. 94.

[35] D.I. 122.

[36] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, LP*, 624 A.2d 1199, 1205 (Del. 1993) (internal citations omitted).

grant judgment on the pleadings in favor of the moving party.[37]

H.    "The first step when analyzing a case involving the internal affairs of an LLC is . . . to examine the LLC agreement to determine whether it addresses the issue."[38] A Delaware limited liability company is a "creature of contract" and its members "must appreciate that 'with the benefits of investing in alternative entities often comes the limitation of looking to the contract as the exclusive source of protective rights.'"[39]

I.    "[W]hen analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts."[40] The Court aims to "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[41] The Court will "give effect to the plain-meaning of the contract's terms and provisions,"[42]

---

[37] *Lillis v. AT&T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) (internal quotations and citations omitted).

[38] *Godden v. Franco*, 2018 WL 3998431, at *7 (Del. Ch. Aug. 21, 2018).

[39] *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017) (quoting *The Haynes Fam. Tr. v. Kinder Morgan G.P., Inc.*, 2016 WL 912184, at *2 (Del. Mar. 10, 2016) (TABLE)); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define . . . the rights and obligations of its members.").

[40] *Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 924 (Del. 2023) (quoting *Absalom Absalom Tr. v. Saint Gervais LLC*, 2019 WL 2655787, at *2 (Del. Ch. June 27, 2019)).

[41] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted) (quoting *GMG Cap. Inv., LLC. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[42] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010); *see also Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning.").

will "read a contract as a whole[,] and . . . will give each provision and term effect, so as not to render any part of the contract mere surplusage."[43]

J.      Where an LLC agreement covers the issue, the agreement controls unless it violates a mandatory provision under the Delaware Limited Liability Company Act (the "Act").[44]  If the agreement is silent on an issue the Court looks to the Act "to see if one of its default provisions apply."[45]

K.      Here, the JV Agreement as amended by the Letter Agreement offers unambiguous guidance, as supplemented by the Act, on the removal of MCS's designated Manager;[46] the removal of MCS's representative as Vice President and Operational Director;[47] and the termination of MCS's membership and the repurchase of its interest.[48]  The JV is manager-managed with five managers (the "Managers").[49] The JV Agreement vests the JV's management and day-to-day business with the Managers.[50]  "Actions or decisions by the Managers will be made by majority vote of

---

[43] *Osborn,* 991 A.2d. at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp*., 990 A.2d 393, 396–97 (Del. 2010)).

[44] *In re Coinmint, LLC*, 261 A.3d 867, 900 (Del. Ch. 2021).

[45] *Holifield*, 304 A.3d at 923 (quoting *Coinmint*, 261 A.3d at 900–01).

[46] JV Agr. § 12.1.

[47] *Id*. § 10.4.1.

[48] *Id*. §§ 1.2, 9.7; Letter Agr. ¶¶ 3, 8.

[49] JV Agr. §§ 1.26, 10.1; *see id*. 11.1.

[50] *Id*. §§ 10.1(a), 11.1 ("Except as other provided in the Agreement Members shall take no part in the control, conduct or operation of the [JV] and shall have no right or authority to act for or bind the [JV], including during the winding up period following dissolution of the [JV].").

the Managers, unless otherwise indicated herein."[51]   The JV Agreement requires unanimous Manager consent to "approve a substantial change in the business of the LLC."[52]  The JV Agreement grants MERA the right to appoint three Managers; MCS and La Farm each have the right to appoint one Manager.[53]  MCS appointed Tamara Mora.[54]

L. Section 12.1 governs the removal of Managers:

> Any Manager may be removed at any time, with or without cause, by the vote of the Majority of the Members at a meeting called expressly for that purpose, or by the written consent of the Majority of the Members.  Any removal shall not affect the Manager's rights as a Member, if any, or constitute withdrawal of a Member.  Notice of removal shall be served on the Manager and shall set forth the date on which the removal becomes effective. [55]

The JV Agreement defines the term "Majority" as "Members collectively holding more than 50% of the Percentage Interest of all the Members."[56]  MERA holds a Majority of the JV's Percentage Interest, specifically 67%.[57]

M. The JV Agreement authorizes the Managers to appoint "Members or Managers" to serve as an Officer and/or Operational Director of the JV.[58]  The

---

[51] *Id*. § 10.1(a); *id*. § 1.26 ("Unless otherwise provided herein, actions or decisions by the Managers will be made by majority vote of the Managers.").

[52] *Id*. § 10.2.2(d).

[53] *Id*. § 1.26.

[54] Ans. ¶ 13.

[55] JV Agr. § 12.1.

[56] *Id*. § 1.25.

[57] Letter Agr. ¶ 2, Ex. A.

[58] JV Agr. § 10.4.1.

Managers appointed Mora to serve as Vice President and Operational Director.[59]

N.    Under JV Agreement Section 10.4.1, "[t]he Managers may remove any Officer or Operational Director with or without cause at any time."[60]  The JV Agreement is silent on whether such a removal can be effectuated by written consent. In such an instance, Section 18-404(d) authorizes managers to act by written consent if the managers could otherwise effectuate the act or decision under the limited liability company agreement.[61]

O.    Section 9.7 of the JV Agreement, as amended by the Letter Agreement, provides that when a Member or its representative ceases to serve as an Operational Director "for any reason," the Member becomes a "Terminated Member," and the JV has the right to repurchase the Terminated Member's membership interest.[62]  Under the January 25 Written Consent, a Majority of Managers resolved to remove MCS's representative as Operational Director.[63]   Once that occurred, MCS became a Terminated Member.[64]

---

[59] *Id*. at Ex. D.

[60] *Id*. § 10.4.1.

[61] 6 *Del. C*. § 18-404(d) ("Unless otherwise provided in a limited liability company agreement, on any matter that is to be voted on, consented to or approved by managers, the managers may take such action without a meeting, without prior notice and without a vote if consented to or approved, in writing, by electronic transmission or by any other means permitted by law, by managers having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all managers entitled to vote thereon were present and voted.").

[62] Letter Agr. ¶ 8.

[63] Jan. 25 Written Consent § I.

[64] Letter Agr. ¶ 8.

P.     The January 25 Written Consent purported to repurchase MCS's membership interest.[65] That transaction is governed by JV Agreement Section 9.7, as amended by the Letter Agreement.[66] That language provides that:

> If a Member or its principal or representative ceases to serve as an Operational Director of the [JV] for any reason, whether upon removal, resignation or otherwise (a "Terminated Member"), for six (6) months following the termination of the Terminated Member's status as an Operational Director, the [JV] shall have the option to purchase the Terminated Member's Interest at the then current Interest Purchase Price for each one percent of Percentage Interest owned by the Terminated Member; . . . The purchase and sale of the Terminated Member's Interest shall close on a specified date and time within 30 days after the [JV] exercises this option by providing written notice to the Terminated Member, at which time twenty-five (25%) percent of the total purchase price applicable hereunder shall be due and payable. The balance of such applicable purchase price shall be paid to the Terminated Member in five annual equal installments (commencing on the first anniversary of the closing date).  If the [JV] does not exercise its option to purchase the Terminated Member's Percentage Interest within the aforementioned six (6) month period, then the option shall expire and shall be null and void and the Terminated Member's Interest shall remain with the Member.[67]

Q.     JV Agreement Section 1.20, as amended by the Letter Agreement, sets forth the procedure for determining the "Interest Purchase Price" of a Terminated Member's Membership Interest:

> Unless otherwise provided in this Agreement, the purchase price for each one percent of Percentage Interest.  The Interest Purchase Price shall be determined and redetermined by the Members as follows: (i) The Interest Purchase Price shall be determined by the mutual agreement of a Majority

---

[65] Jan. 25 Written Consent § IV.

[66] Letter Agr. ¶ 8; *id*. ¶ 3 (defining the procedure to determine the Interest Purchase Price).

[67] *Id*. ¶ 8.

11

the Members on an annual basis within 30 days following the end of each fiscal year. The Interest Purchase Price as determined by the Members shall be set forth on Exhibit "C". (ii) In the event the Members fail to determine or redetermine the Interest Purchase Price for a particular year, the Interest Purchase Price for any purpose of this Agreement shall be determined by a neutral CPA with expertise in valuation of closely-held businesses, as appointed by mutual agreement of the Members. In the event the Members fail to agree on the appointment of a neutral CPA, each Member shall appoint one CPA, and each such CPA shall vote to appoint a neutral CPA (which may or may not be one of the CPAs appointed by the Members) and such appointed CPA shall act as the neutral CPA for purposes hereof.[68]

IT IS HEREBY ORDERED, this 15th day of June, 2026 that:

1. A Majority of Members validly removed MCS's designated Manager. Section 12.1 authorizes the removal of a Manager by "written consent of the Majority of Members" with service of notice of removal.[69] The January 25 Written Consent was approved by a Majority of Members, and notice of the removal was provided.[70]

a. Contrary to MCS's argument, MCS's right to designate one Manager has no bearing on the removal of an MCS-designated Manager.[71] Section 1.26 grants MCS the right to designate one Manager.[72] That right coexists with Section 12.1's manager removal regime; they are not inconsistent, and neither trumps the other.

b. MCS also argues the removal of its designated Manager is a "substantial change in the business of the [JV]" that requires the Members' unanimous

---

[68] *Id.* ¶ 3.

[69] JV Agr. § 12.1.

[70] Jan. 25 Written Consent § 3; *id.* at 5; POB at Ex. 8 (providing notice of removal).

[71] JV Agr. § 1.26.

[72] *Id.*

12

consent.[73]  Not so.  The JV Agreement unambiguously sets different voting thresholds for different acts.  Section 11.2 provides that  "Members shall have voting rights in proportion to their Percentage Interests" and "[a]ny act requiring a vote of the Members . . . shall require approval by a Majority unless a greater Percentage Interest is specified."[74]  The term "Majority" means "Members collectively holding more than 50% of the Percentage Interest of all the Members."[75]  From there, Section 12.1 plainly conditions the removal of a Manager on the approval of a Majority of the Members.[76]  There are indeed six specific acts or decisions that require "unanimous consent of the Members" to authorize the JV to act, including "to approve a substantial change in the business of the [JV]."[77]  Every provision of the JV Agreement must be given effect according to its plain meaning: applying the Member unanimity requirement to Manager removal would read Section 12.1 out of the JV Agreement.[78]  And the provision specifically governing Manager removal governs that act over a more general provision that might otherwise be stretched to cover that act.[79]

---

[73] DAB at 3, 33–37.

[74] JV Agr. § 11.2.

[75] *Id*. § 1.25.

[76] *Id*. § 12.1.

[77] *Id*. §§ 10.2.2.(a)–(f).

[78] *Holifield*, 304 A.3d at 924 ("When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language. Contracts will be interpreted to give each provision and term effect and not render any terms meaningless or illusory." (quoting *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021))).

[79] *Coinmint*, 261 A.3d at 900; *DCV Hldgs., Inc. v. ConAgra, Inc*., 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific

13

2. A Majority of Managers validly removed MCS's representative Mora from the positions of Vice President and Operational Director.[80] Under Section 10.4.1, "[t]he Managers may remove any Officer or Operational Director with or without cause at any time."[81] The JV Agreement explains that actions by Managers may be made by majority vote unless otherwise specified.[82] Absent a contractual prescription otherwise, the majority may act by written consent.[83] The January 25 Written Consent was approved by a Majority of Managers.[84]

3. Under the JV Agreement as amended by the Letter Agreement, upon the removal of MCS's designee as Operational Director, MCS became a Terminated Member, and the JV had the option to repurchase MCS's interest "at the then current Interest Purchase Price."[85]

a. The Letter Agreement amended the repurchase regime to kick in if

---

and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[80] Jan. 25 Written Consent §§ I–II.

[81] JV Agr. § 10.4.1.

[82] *Id.* §§ 10.1(a), 1.26.

[83] 6 *Del. C.* § 18-404(d).

[84] Jan. 25 Written Consent at 5.

[85] Letter Agr. ¶ 8 ("The purchase and sale of the Terminated Member's Interest shall close on a specified date and time within 30 days after the LLC exercises this option by providing written notice to the Terminated Member, at which time twenty-five (25%) percent of the total purchase price applicable hereunder shall be due and payable. The balance of such applicable purchase price shall be paid to the Terminated Member in five annual equal installments (commencing on the first anniversary of the closing date). If the LLC does not exercise its option to purchase the Terminated Member's Percentage Interest within the aforementioned six (6) month period, then the option shall expire and shall be null and void and the Terminated Member's Interest shall remain with the Member.").

the Operational Director is removed.[86] MCS argues the Court should not enforce the amendments because it was coerced into agreeing to the Letter Agreement.[87] But MCS was all too happy to take the benefits of the Letter Agreement: MCS admitted in its Answer it received a 28% membership interest stake, which the Letter Agreement increased from 26.4%.[88] "The retention of benefits defeats a claim of duress or undue influence as it is axiomatic that a party cannot both accept the benefits which accrue under a contract on the one hand and shirk its disadvantages on the other."[89]

        b.      Finally, MCS swings for the fences and argues Section 9.7 of the JV Agreement, as amended by the Letter Agreement, is unlawful because it violates federal regulations in permitting the unilateral and involuntary removal of an ACDBE participant without RDUA approval.[90] "Illegality is an affirmative defense on which [MCS] bear[s] the burden of proof."[91] Delaware courts may find a contract

---

[86] *Compare* JV Agr. § 9.7 ("If a Member *voluntarily terminates* its statute as an Operational Director of the [JV] for any reason (in either or both cases, a 'Terminated Member'), for six (6) months following the termination of the Member's status as Operational Director, the [JV] shall have the option to purchase the Terminated Member's Interest at the then-current Interest Purchase Price . . . .") *with* Letter Agr. ¶ 8 ("If a Member or its principal or representative *ceases to serve* as an Operational Director of the LLC for any reason, *whether upon removal, resignation or otherwise* (a "Terminated Member"), for six (6) months following the termination of the Terminated Member's status as an Operational Director, the LLC shall have the option to purchase the Terminated Member's Interest at the then current Interest Purchase Price . . . .") (emphasis added).

[87] DAB at 47–49.

[88] Ans. ¶ 22; Letter Agr. ¶ 1; *see* JV Agr. §§ 4.3, 4.7.

[89] *Standard General L.P. v. Charney*, 2017 WL 6498063, at *17 (Del. Ch. Dec. 19, 2017) (internal quotation omitted).

[90] DAB at 47–48.

[91] *HREF S'r Worthington LLC v. Conroe WM LLC*, 2026 WL 84352, at *20 (Del. Ch. Jan. 12, 2026) (quoting *Lighthouse Behav. Health Sols., LLC v. Milestone Addiction Counseling,*

unenforceable if it is illegal *per se* or violative of public policy.[92]  At the same time, our courts "hold freedom of contract in high—some might say, reverential—regard. Only 'a strong showing that dishonoring a contract is required to vindicate a public policy interest even stronger than freedom of contract will induce our courts to ignore unambiguous contractual undertakings.'"[93]  "[C]ourts are averse to voiding agreements on public policy grounds unless their illegality is clear and certain" and Delaware courts exercise "this authority with caution, an only in cases that are free from doubt."[94]

        c.     Indeed, the CFR requires "good cause" and RDUA's consent prior to terminating an ACDBE member like MCS.[95]  But MCS did not plead the governing agreements are illegal in its Answer, as it must.[96]  And the JV Agreement does require

---

*LLC*, 2023 WL 3486671, at *10 (Del. Ch. May 17, 2023)); Ct. Ch. R. 8(c)(1).

[92] *HREF*, 2026 WL 84352, at *20.

[93] *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 676–77 (Del. 2024) (quoting *ev3, Inc. v. Lesh*, 103 A.3d 179, 181 n.3 (Del. 2014)); *see Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015) ("This jurisdiction respects the right of parties to freely contract and to be able to rely on the enforceability of their agreements; where Delaware's law applies, with very limited exceptions, our courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering, both in recognition of a right to self-order and to promote certainty of obligations and benefits.").

[94] *Bennett v. Lally*, 2014 WL 4674623, at *4 (Del. Ch. Sept. 5, 2014) (quoting *Sann v. Renal Care Centers Corp.*, 1995 WL 161458, at *5 (Del. Super. Mar. 28, 1995))

[95] 49 C.F.R. §§ 26.53(f)(1)–(6).

[96] Ct. Ch. R. 8(c); *see* Ans. (failing to raise any affirmative defenses); *Griffith v. DelValle*, 2009 WL 3152882, at *2 (Del. Com. Pl. Sept. 3, 2009) (considering Court of Common Pleas Civil Rule 8(c)'s same requirement and concluding illegality could not be raised after trial: "Since the Defendant did not raise the illegality of the Lease as a defense to the Plaintiff's claims until his closing argument at trial, this defense was waived and no further analysis of the issue will be made by the Court.").

RDUA approval.[97]  Section 4.7 provides, "[I]n no event shall the percentage interest held by MCS be diluted to less than [28%], unless such dilution is in connection with attaining substitute ACDBE participation through direct leasing, subleasing, subcontracting, or joint venture, as determined by MERA or MCS with the prior consent of MERA, in each instance subject to the approval of RDU[A]." [98]  The Lease Agreement also requires RDUA approval.[99]  And RDUA found good cause and granted approval.[100]

4.      The JV has the right to repurchase MCS's interest.  But MCS has the right to have a neutral CPA determine the Interest Purchase Price.[101]  Absent an annual mutual agreement of a Majority of the Members, "the Interest Purchase Price . . . shall be determined by a neutral CPA with expertise in valuation of closely-held businesses, as appointed by mutual agreement of the Members."[102]  If the Members cannot agree to a neutral CPA, "each Member shall appoint one CPA, and each such CPA shall vote to appoint a neutral CPA (which may or may not be one of the CPAs appointed by the

---

[97] JV Agr. § 4.7.

[98] *Id*. § 4.7 (emphasis added); Letter Agr. ¶ 1 (amending MCS's member interest to be 28%).

[99] Lease Agr. §§ 21, 21.3, 21.5.  The Lease Agreement requires RDUA's "prior written consent" to terminate or replace an ACDBE participant, like MCS.  *Id*. § 21.3.

[100] POB at Ex. 4 ("MERA has provided several examples that illustrate failure or refusal to perform the work in a way consistent with normal industry standards. . . . The [RDUA] has reviewed the documentation provided and has determined that MERA has provided documentation sufficient to demonstrate 'good cause.'  Therefore, the [RDUA] is providing written consent to the termination per the requirements of 49 CFR Part 26(f)(3) via this correspondence.").

[101] Letter Agr. ¶ 3.

[102] *Id*.

Members) and such appointed CPA shall act as the neutral CPA for purposes" of determining the Interest Purchase Price.[103]

5.      The parties must follow the valuation procedure they agreed upon.[104]  The January 25 Written Consent's determination of an Interest Purchase Price contravened the JV Agreement, as amended by the Letter Agreement, and is therefore defective. [105] The parties are hereby ordered to perform under Section 1.20 of the JV Agreement as amended by the Letter Agreement to determine the "then current Interest Purchase Price."[106]

6.      The status quo order is hereby lifted.  The January 25 Written Consent validly removed MCS's representative as Operational Director, Vice President, and Manager.  Therefore, MCS is a Terminated Member with all attendant rights, including the right to appoint a neutral CPA to determine the Interest Purchase Price.[107]

---

[103] *Id.*

[104] *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *24 (Del. Ch. May 13, 2013) ("Delaware is a state that respects the freedom of contract.  Thus, when two parties have a contract on which a payment must be made, they are free to determine the basis for that payment. For example, if parties determined that a contractual payout would be determined in part by rainfall on a particular day in a particular location, they could stipulate that the rainfall would be as reported by the National Weather Service."); *id.* at *25 ("When a contract plainly says that a contractual input (the value of a certain property) will be determined by an appraiser selected in accordance with the contract's terms, that is what it plainly means."); *Viacom Int'l, Inc. v. Winshall,* 2012 WL 3249620, at *18 (Del. Ch. Aug. 9, 2012) (contract provided that "resolution accountants" should resolve parties' disputes over the payout of an earnout, and that a court should review the accountants' figure under a standard very close to that of the Federal Arbitration Act).

[105] *Coinmint*, 261 A.3d at 890 ("Actions that do not comport with an operating agreement's terms may be void or voidable.").

[106] Letter Agr. ¶¶ 3, 8.

[107] *Id.* ¶¶ 3, 8; JV Agr. §§ 1.20, 9.7.

7.      Judgment shall be entered in MERA's favor in part on Count II of the Amended Complaint.

_/s/ Morgan T. Zurn_
Vice Chancellor
